Jim VANDERBILT, Appellant,

v.

The STATE of Texas, Appellee.

No. 66710.

Court of Criminal Appeals of Texas.

Sept. 23, 1981.

Rehearing Denied Nov. 4, 1981.

Certiorari Denied March 29, 1982.
See 102 S.Ct. 1760.

Gene Storrs, Amarillo, for appellant.

Stephen M. Rienstra, Atty. pro tem, Beaumont, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is from conviction for capital murder. Trial was in Jefferson County following change of venue from Potter County. After finding appellant guilty of capital murder, the jury returned affirmative findings to the first two special issues under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death.

In his fourth ground of error the appellant contends that there was insufficient evidence to support a finding that the murder was committed in the course of kidnapping or attempted kidnapping.

The evidence shows that the victim, Katina Moyer, was a sixteen-year-old high school student. She was seen leaving a parking lot at the Amarillo High School at approximately 3:15 p. m., April 1, 1975, driving her mother's red Chevrolet station wagon. This automobile had imitation wood paneling on the side, a paper dealer's license plate, and a Dallas Cowboys sticker on the rear window. Thus, the evidence establishes that the vehicle had distinctive recognizable characteristics.

Katina Moyer was expected to pick up her mother, a school teacher, from the Palo Duro High School in Amarillo at approximately 3:35 p. m. Miss Moyer customarily waited in the car on the parking lot until her mother got off work. When Mrs. Moyer completed her duties on April 1, 1975, her daughter was not waiting on the parking lot.

Frances Kearns, a neighbor of appellant, testified that she saw the Moyer's red station wagon parked in front of appellant's home on the afternoon of April 1, 1975. Kearns stated that she saw appellant leave his house with a girl matching the victim's description, and get into the red station wagon. Kearns testified that the girl with appellant that day had long brown hair, much like the victim's hair, and that the girl had something draped over her shoulder so that Kearns could not see the girl's hands. Kearns identified a photograph of appellant's wife and verified that the girl she saw with appellant that afternoon was not his wife. Kearns had never seen the girl or the red station wagon in the vicinity of appellant's home prior to April 1, 1975. Appellant's home is situated within a few blocks of the Palo Duro High School where Miss Moyer was scheduled to pick up her mother.

Elton Walcott testified that on April 1, 1975 between 4:30 p. m. and 5:00 p. m. his family was nearly involved in a traffic accident with the Moyer's red station wagon. He stated that his wife was driving at the time and he was able to positively identify both the Moyer's vehicle and appellant as the driver. There was also a white female with long dark hair, like Katina Moyer's, in the station wagon with appellant. Mr. Walcott last saw the vehicle northbound on Dumas Highway and stated that appellant seemed to be in a hurry.

Mrs. Walcott positively identified the Moyer's station wagon as the vehicle she nearly collided with on April 1, 1975. She testified that the auto was driven by a white male with a tiny moustache and that a white female with long dark hair was the only other passenger. These descriptions are consistent with the physical appearances of appellant and Miss Moyer on the date of the offense.

Mary Fuller testified that she was driving south on Dumas Highway from Dumas on April 1, 1975. At approximately 6:00 p. m. she noticed a red station wagon, like the one owned by the Moyer family, parked alongside Dumas Highway near the intersection of Cactus Drive. The vehicle appeared to be unoccupied and the fourway emergency lights were flashing. Fuller saw appellant along the side of the highway approximately "half a block" from the red station wagon and stopped to offer him a ride. The appellant was dressed "casually," wearing a "windbreaker" or jacket, white shirt, and "Levi slacks." He accepted the ride and told her his car had broken down. He denied ownership of the station wagon, stating that his car had broken down "further back up the road." Fuller testified that she had just driven between 50 and 60 miles on the highway and had not seen any vehicles parked thereon that appeared to be broken down. Fuller stated that she had several children and was aware that young people frequently have car trouble. Consequently, it was her habit to be very watchful for stalled vehicles and stranded motorists.

Fuller offered to take appellant home, however, he stated that he could not remember his address and asked to be let out

near a service station so that he could get assistance. After leaving appellant near the service station, Fuller noticed that he stood watching her as she drove away, and that he appeared to be holding a white handkerchief which she had not previously noticed. Rather than approaching the service station, appellant turned and walked toward a nearby park.

The Moyer's station wagon was located by police at approximately 10:00 p. m. on April 1, 1975. The vehicle was found unoccupied on the shoulder of the southbound lane of Dumas Highway near Cactus Drive, approximately 600 yards from the Amarillo city limits. The front portion of the automobile was facing south. An Amarillo police officer testified that he thoroughly "dusted" the vehicle searching for latent fingerprints, but was unable to obtain any identifiable fingerprints. While the officer did not state unequivocally that the vehicle had been wiped clean of fingerprints, he did testify that based upon his experience it was unusual to find no fingerprints on an automobile.

At approximately 2:10 a. m., April 2, 1975, Katina Moyer's body was found on Gluck Pens Road approximately one mile east of Dumas Highway. Gluck Pens is a rural dirt road that intersects with Dumas Highway approximately six miles north of the location where the abandoned station wagon had been recovered.

The results of an autopsy performed on April 2, 1975 showed that the cause of death was a gunshot wound through the head. The approximate time of death was between 6:00 p. m. April 1 and 1:00 a. m. April 2. The pathologist testified that bruises found on the victim's wrists and forearms occurred before death. Further, that there had been some type of binding on the decedent's wrists, and that the bruises could have been caused by handcuffs.

Prior to her disappearance and death, no bruises had been observed on the victim's body. The State presented evidence that Katina Moyer had never been known to pick up a hitchhiker, and she had not previously been acquainted with appellant.

Jerre Kris Tucker testified that she had been sexually molested by appellant on March 27, 1975. She was 21 years old at that time and employed at a shopping mall in Amarillo. On that evening she got off work at approximately 9:15 p. m., and was sitting alone in her car on the parking lot adjusting her makeup before leaving. Appellant opened the driver's door of her car, produced a pistol, and demanded that she move over. Appellant entered the car, drove it a short distance, then pulled over. At that time he instructed Tucker to turn around and put her hands behind her back. He then produced a pair of handcuffs and proceeded to handcuff Tucker's hands behind her back.

The appellant drove Tucker to an area in southwest Amarillo where residential construction was in progress. The area was secluded at that time of the evening. Appellant parked the car in an alley between unoccupied new houses and sexually molested Miss Tucker. He later released her several blocks from her place of employment, and left her car on the parking lot where the original abduction occurred.

Shortly after appellant had entered Miss Tucker's car he had put on a pair of her gloves and carefully wiped the steering wheel and gearshift lever. The appellant was wearing dress slacks and a "sport coat" type of jacket when he accosted Tucker.

The evidence shows that appellant had been an Amarillo police officer. On April 11, 1975 police officers searched the appellant's residence and seized the following items of evidence therefrom: a .41 caliber Smith & Wesson revolver; a box of .41 caliber ammunition; a box in which the .41 caliber pistol had been purchased; a box containing both live rounds and spent shell casings of .357 caliber ammunition; the box in which a Smith & Wesson .357 caliber revolver had been purchased; and a pair of handcuffs.

The evidence established that appellant purchased a Smith & Wesson .357 caliber revolver from the Amarillo Police Department on March 10, 1975. This weapon was

not admitted in evidence. Appellant had also purchased three sets of handcuffs from the Amarillo Police Department between December 3, 1974 and March 21, 1975. The handcuffs seized at his residence were purchased from the Police Department on March 21, 1975.

Miss Tucker was shown the .41 caliber revolver seized at appellant's residence and a .357 caliber revolver of the same make and model as the one purchased by appellant. She testified that the gun used by appellant when he abducted her looked similar to these weapons, but could not say that it looked more like one than the other.

Miss Tucker was asked to examine the handcuffs seized from appellant's residence. After doing so she testified that they looked and felt like those appellant had used to bind her hands behind her back. Laboratory analysis of the handcuffs found in appellant's residence disclosed a small spot of blood. That blood spot was found to be human blood, Type A Positive—the same blood type as Katina Moyer's.

On April 18, 1975 a .38 caliber slug was recovered by the police approximately 250 feet from where the body had been found on Gluck Pens Road. Subsequent laboratory analysis disclosed 3 hair fragments embedded in the slug. Lesly Smith, a chemist and toxicologist employed by the Department of Public Safety, examined these fragments and compared them with samples of the victim's hair. Based upon his analysis, Smith testified that he was reasonably certain that the hair fragments embedded in the slug had come from Katina Moyer.

Ronald D. Richardson, a firearms examiner employed by the Department of Public Safety, testified that the slug was a .38 caliber lead projectile which could have been fired from a .357 caliber revolver. The bullet was found to have a "Lubaloy" coating. Richardson stated that he knew of only one brand of .357 or .38 caliber ammunition commercially manufactured with a "Lubaloy" finish in 1975. That brand name was Western. The .357 caliber cartridges seized from the appellant's residence were Western brand with "Lubaloy" coating.

Richardson also testified that some bullets were manufactured with cannelures—small protrusions or "knurls" on the slug. Richardson compared the cannelure configuration of the bullet recovered with the .357 caliber ammunition seized from the appellant's home as well as a sample of Western brand .38 caliber ammunition. He stated that the bullet recovered had three cannelures and was consistent with the .357 caliber ammunition taken from appellant's home. The Western brand .38 caliber ammunition examined had only two cannelures.

The elements of kidnapping are that a person:

(1) intentionally or knowingly

(2) abducts

(3) another person.

V.T.C.A.Penal Code, Sec. 20.03. Cf. *Phillips v. State*, Tex.Cr.App., 597 S.W.2d 929.

> " 'Abduct' means to restrain a person with intent to prevent his liberation by:
>> "(A) secreting or holding him in a place where he is not likely to be found; or
>> "(B) using or threatening to use deadly force."

*Id.* Sec. 20.01(2).

> " 'Restrain' means to restrict a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him. Restraint is 'without consent' if it is accomplished by:
>> "(A) force, intimidation, or deception; or
>> "(B) any means, including acquiescence of the victim, if he is a child less than 14 years of age or an incompetent person and the parent, guardian, or person or institution acting in loco parentis has not acquiesced in the movement or confinement."

*Id.* Sec. 20.01(1).

When reviewing the sufficiency of evidence to support conviction, this Court must examine the evidence in the light

most favorable to the verdict. The jury is the exclusive judge of the facts, the credibility of witnesses, and the weight to be afforded testimony. E.g., *Miller v. State*, Tex.Cr.App., 566 S.W.2d 614.

Conviction based upon circumstantial evidence cannot be sustained unless the circumstances exclude every reasonable hypothesis except guilt of the defendant. Proof amounting to no more than a strong suspicion or mere probability of guilt is not sufficient. E.g., *Schershel v. State*, Tex.Cr.App., 575 S.W.2d 548; *Bryant v. State*, Tex.Cr.App., 574 S.W.2d 109. Nevertheless, it is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Sullivan v. State*, Tex.Cr.App., 564 S.W.2d 698; *Flores v. State*, Tex.Cr.App., 551 S.W.2d 364; *Herndon v. State*, Tex.Cr.App., 543 S.W.2d 109. The rules of circumstantial evidence do not require that the circumstances exclude to a moral certainty every hypothesis that the offense may have been committed by another person. The defensive hypothesis must be a reasonable one, consistent with the facts proved and the circumstances, and the premise that the offense may have been committed by another person must not be out of harmony with the evidence. See e.g., *Sullivan v. State*, supra; *Flores v. State*, supra; *Jones v. State*, Tex.Cr.App., 442 S.W.2d 698, cert. denied, 397 U.S. 958, 90 S.Ct. 967, 25 L.Ed.2d 143 (1970).

We find the evidence sufficient to support a finding that the murder of Katina Moyer was committed in the course of kidnapping or attempted kidnapping.

In his third ground of error appellant contends the trial court erred in admitting the aforementioned testimony of Jerre Tucker. He maintains that Tucker's testimony constitutes inadmissible evidence of an extraneous offense.

It is well established that an accused may not be tried for some collateral crime or for being a criminal generally. E.g., *Rubio v. State*, Tex.Cr.App., 607 S.W.2d 498, *Albrecht v. State*, Tex.Cr.App., 486 S.W.2d 97. Nevertheless, evidence relevant to a controverted issue is not necessarily rendered inadmissible because it tends to show the commission of a separate offense. One of the exceptions this Court has recognized to the general prohibition against admission of extraneous offenses is that such evidence may be admissible to establish identity. Evidence of an extraneous offense is admissible when offered to circumstantially prove identity if identity is a controverted issue and there are distinguishing characteristics common to both the extraneous offense and the offense for which the defendant is on trial. See, e.g., *Jones v. State*, Tex.Cr.App., 568 S.W.2d 847, cert. denied, 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 352 (1978); *Cameron v. State*, Tex.Cr.App., 530 S.W.2d 841; *Ransom v. State*, Tex.Cr.App., 503 S.W.2d 810.

We have previously held that when identity of an accused is established solely by circumstantial evidence, the issue of identity is controverted. See *Jones v. State*, Tex.Cr.App., 568 S.W.2d 847; *Hinkle v. State*, Tex.Cr.App., 442 S.W.2d 728. Since appellant's conviction is based upon circumstantial evidence, identity was a controverted issue.

The thrust of appellant's complaint on appeal is that there were not sufficient distinguishing characteristics common to both the extraneous offenses and the instant offense to justify the admission of Tucker's testimony. The evidence can be construed as showing: (1) both victims were young women; (2) both victims were alone at the time they were accosted; (3) each victim was sitting in her car on a parking lot; (4) the victims were abducted; (5) in both cases the perpetrator used a revolver; (6) in both instances the perpetrator was wearing a jacket which could conceal a handgun and handcuffs; (7) both victims were bound or handcuffed; (8) in each case the perpetrator drove the victim's car; (9) both women were transported to secluded areas; (10) in both instances fingerprints were absent or wiped from the victim's auto; (11) both crimes occurred

717

near Amarillo; (12) the offenses occurred within a five day period. We find these common characteristics sufficient to justify the admission of Tucker's testimony. Appellant's third ground of error is overruled.

In his first ground of error the appellant contends that the trial court erred in refusing to set aside the indictment pursuant to the provisions of the Speedy Trial Act. Art. 32A.02, V.A.C.C.P. The appellant has presented three separate contentions in support of this ground of error. These will be examined in the order presented.

█ The mandate from this Court reversing appellant's prior conviction for the instant offense was issued on April 19, 1978. See *Vanderbilt v. State*, Tex.Cr.App., 563 S.W.2d 590. Appellant was still in custody on July 1, 1978 when the Speedy Trial Act became effective. Disposition of this ground of error does not require consideration of time that elapsed prior to the effective date of the Act. *Wade v. State*, Tex. Cr.App., 572 S.W.2d 533.

In his first contention the appellant asserts that he filed a pro se petition for writ of habeas corpus on October 17, 1978, and that this petition constituted an attempt to exercise his rights under the "Speedy Trial Act." Art. 32A.02, supra. He maintains that the 181st District Court of Potter County entered an order denying the petition without first affording him a hearing thereon. Appellant cites *Riggal v. State*, Tex.Cr.App., 590 S.W.2d 460 in support of his contention that the trial court's ex parte disposition of his petition was error.

The record before us contains no instrument entitled "petition for writ of habeas corpus" relating to the Speedy Trial act, nor any court order denying such a petition. The docket sheet contains an entry indicating that an order denying a petition for writ of habeas corpus was signed on November 13, 1978, however, the docket entry includes no additional information regarding either the petition or the order.

█ The record contains no request by appellant that the missing materials be included in the record, nor any objection to

their omission pursuant to Art. 40.09, Secs. 2 and 7, V.A.C.C.P. In *Lynch v. State*, Tex.Cr.App., 502 S.W.2d 740 we stated: "[W]here the absence of material from the record is occasioned by the oversight or nonobjection of the accused, it has generally been held that any error in the record has been waived." *Id.* at 741 (on motion for rehearing); see *Paige v. State*, Tex.Cr.App., 573 S.W.2d 16; *Stockton v. State*, Tex.Cr. App., 487 S.W.2d 69; *Johnson v. State*, Tex. Cr.App., 466 S.W.2d 744. In *Rhoda v. State*, Tex.Cr.App., 514 S.W.2d 937 we held:

"The right of an indigent appellant to a free statement of facts is independent of the requirement that a statement of facts, free or otherwise, be requested at the appropriate stage of the appellate process. If that requirement not be met, the right to have it included in the record on appeal is waived. Since appellant was represented by counsel who was actively pursuing his appeal and no request for a statement of facts was made, we conclude appellant's right to have it included in the record was waived."

*Id.* at 939. Assertions in an appellate brief that are unsupported by the record will not be accepted as fact. E.g. *Thompson v. State*, Tex.Cr.App., 612 S.W.2d 925; *Herrin v. State*, Tex.Cr.App., 525 S.W.2d 27. Since the appellate record contains no pro se petition for writ of habeas corpus nor any court order denying same appellant's first argument in support of this ground of error presents nothing for review.

On November 13, 1978 the 181st District Court of Potter County entered an order changing venue in this cause to Tarrant County. Following pretrial hearings conducted in Criminal District Court No. 2 of Tarrant County, that court granted the appellant's motion to suppress both oral and written confessions. Thereafter, the State's Attorney filed a motion to dismiss the cause, asserting that, without the suppressed confessions, the State lacked sufficient evidence to proceed with its case against the appellant. The Tarrant County court granted the motion and dismissed the cause on February 8, 1979. On March 15,

1979 the Potter County grand jury reindicted appellant for the instant offense.

Appellant's second contention in support of this ground of error relates to the time period beginning November 13, 1978 and ending March 15, 1979. The gravamen of this complaint is that the period of time from dismissal of the cause on the State's motion, February 8, 1979, through reindictment on March 15, 1979 should not be excluded when computing the State's time limitations pursuant to the Speedy Trial Act.

Art. 32A.02 provides in pertinent part:
" . . .

"Sec. 4. In computing the time by which the state must be ready for trial, the following periods shall be excluded:
" . . .

(7) *if the charge is dismissed upon motion of the state* or the charge is disposed of by a final judgment and the defendant is later charged with the same offense or another offense arising out of the same transaction, the period of delay *from the date of dismissal* or the date of the final judgment *to the date the time limitation would commence running on the subsequent charge had there been no previous charge* ;"

*Id.* (emphasis added).

The above provisions are dispositive of appellant's contention. The period of time following dismissal of the cause on motion of the State until the subsequent reindictment is properly excluded from computation of time limitations under the Act. Appellant's second contention in support of this ground of error is without merit.

Following reindictment the 320th District Court of Potter County granted appellant's motion for change of venue and the cause was transferred to the Criminal District Court of Jefferson County. Appellant's third contention in support of this ground of error relates to pretrial hearings conducted in the Criminal District Court in Jefferson County beginning July 12, 1979. Appellant contends that his "motion to set aside the case" for the State's noncompliance with Art. 32A.02, supra, was before the court at the hearing on July 12, 1979, that the State neither announced "ready" nor presented any evidence justifying delay, and that the court failed to rule on his motion to set aside the case. The appellant argues that since the State failed to declare its readiness for trial at that hearing, the trial court erred in not granting his motion to set aside the indictment. See *Barfield v. State*, Tex.Cr.App., 586 S.W.2d 538.

At the beginning of these pretrial hearings on July 12, 1979, the trial court announced its intention to hear evidence on four motions then pending; among the four was appellant's "motion to set aside the case." Nevertheless, the record reflects that the focus of the hearings was upon appellant's motion to suppress the confession. The following colloquy occurred on July 13, 1979, with respect to appellant's "motion to set aside the case":

"THE COURT: While that is being done . . . and I'd understood and I think the record should reflect that the motion you filed captioned 'A Motion to Set Aside the Case' based on the provisions of 32A(*o*)2 [sic] *you desire* not to urge at this time but rather [sic] urge at the time of trial. "Is that correct?

"MR. STORRS: That's correct, Your Honor.

"THE COURT: That matter will then be heard at trial if it is re-urged." (Emphasis added).

This clearly shows that appellant requested the delay in consideration of his motion.[1] The third contention in support of appellant's first ground of error is also without merit; the ground of error is overruled.

1. On August 6, 1979, the day voir dire examination began, the trial court conducted a hearing on appellant's motion to set aside the case. The State presented evidence of compliance with the provisions of Art. 32A.02, supra, and the trial court denied appellant's motion. Appellant does not challenge the court's ruling, nor the sufficiency of the evidence in support thereof.

In his second ground of error, appellant contends the trial court erred in allowing Dr. Kenneth McTague, a psychologist, to testify at the punishment phase of the trial as to the probability that appellant would commit acts of violence in the future. Appellant maintains that Dr. McTague's testimony was based upon an examination conducted without first advising him that the examination results would be used against him at a subsequent punishment hearing. Accordingly, he argues that Dr. McTague's testimony at the punishment phase of his trial constitutes a violation of his Fifth Amendment right against self-incrimination.

In *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) the Supreme Court held that the defendant's Fifth Amendment privilege against compelled self-incrimination was violated where he was not apprised that he had a right to remain silent and that any statement he made could be used against him at a capital sentencing proceeding prior to an in-custody court-ordered psychiatric examination to determine his competency to stand trial. The defendant had not been apprised of these rights nor exercised an intelligent waiver thereof prior to the court-ordered psychiatric examination. Statements he made during the examination formed the basis of the psychiatrist's testimony to the effect that the defendant was a sociopath and was likely to commit acts of violence in the future. The Supreme Court held that the defendant had been denied the safeguards of the Fifth Amendment and, thus, his death sentence could not stand.

In the instant case Dr. McTague testified that he had never personally interviewed the appellant. His "psychological evaluation" was based upon analysis of the results of a battery of psychological tests administered to the appellant by Dr. McTague's assistant in September of 1975. McTague apparently performed his evaluation pursuant to an order entered by the trial court prior to the appellant's first trial for the instant offense. See *Vanderbilt v. State*, Tex.Cr.App., 563 S.W.2d 590 (reversing the initial conviction).

Dr. McTague stated that he was directed "to determine the questions of mental illness versus not mental illness, psychopathology, personal characteristics and intellectual factors." While the testimony is not completely clear, Dr. McTague was apparently acting as a consultant to Dr. Crackey, a psychiatrist, who also evaluated the appellant at request of the court. The above directive concerning the scope of Dr. McTague's evaluation apparently came from Dr. Crackey; however, the doctors submitted separate reports concerning their respective evaluations.

The record before us contains no evidence nor any bill of exceptions to establish the circumstances leading up to the court's appointment of Dr. McTague. The only evidence contained in the instant record concerning the purpose of the court-ordered evaluation is the above-quoted testimony of Dr. McTague.

Our review of the appellate record from appellant's prior trial disclosed that it contains no court order authorizing the appointment of a psychologist to evaluate the appellant. *Huffman v. State*, Tex.Cr.App., 479 S.W.2d 62 (the Court may take judicial notice of its records in the same or related proceedings involving the same party); accord, *Reynolds v. State*, Tex.Cr.App., 548 S.W.2d 733 n.1; *Clark v. State*, Tex.Cr. App., 545 S.W.2d 175 n.2. That record does contain a defense motion entitled "Motion for Psychiatric and Psychological Examination." The motion seeks court appointment of a psychiatrist and a psychologist to conduct examinations upon the appellant, however, it does not reflect the purpose for such evaluations. Following a pretrial hearing on the above defense motion, the court at the first trial granted the motion as to the psychiatric evaluation and agreed to appoint a psychologist if the psychiatrist requested the assistance of a psychologist. The record of this pretrial hearing is also silent as to the purpose for these evaluations. Accordingly, we are unable to ascertain whether that trial court authorized these evaluations for the purpose of deter-

mining competency, sanity, future dangerousness, or any combination of these.

Appellant's complaint is based upon the following testimony elicited from Dr. McTague by the State's Attorney at the punishment stage of the trial:

"Q. Is he [appellant] likely to benefit from punishment of any kind?

"A. Probably not unless it was extreme.
" . . .

"Q. Doctor, based upon your evaluation, do you have an opinion as to whether or not Mr. Vanderbilt would be likely to commit other acts of violence?

"A. Predicting violence is very difficult to do. Based on my test data I can only give a gross guess.

"Q. Doctor, assume that the evidence shows that on March 27, 1975, Jim Vanderbilt approached a young woman with a gun, that he handcuffed her, that he took her and her car to an area where there was no one around, that he, while she was still handcuffed, unbuttoned her blouse, loosened her brassiere, fondled her breasts, kissed her breasts, undid her pants and attempted to put his hand in that area, that this young girl persuaded him not to continue with that conduct, and that ultimately he released that girl, that five days later on April 1, 1975, Jim Vanderbilt kidnapped and shot and killed another young girl, now taking those things into consideration, do you have an opinion as to whether or not he would be likely to commit future acts of violence?

"A. Yes, I do. The research indicates that the best predictor of future behavior is past behavior. If someone has done actions like you describe several times, then it is increasing the likelihood they may do it again as opposed to not."

As to the statement that appellant would probably not benefit from punishment unless it was extreme, we fail to discern how such testimony could have harmed appellant even if it was erroneously admitted. At that point in the proceedings appellant had been found guilty, and the only determination to be made at the punishment hearing was whether he was to be assessed life imprisonment or death—both "extreme" punishments. Further, it is difficult to conceive just how the appellant would have "benefited" from the death penalty. Any error associated with the admission of this testimony was clearly harmless beyond a reasonable doubt. See *Wilder v. State*, Tex.Cr.App., 583 S.W.2d 349.

■ The State's Attorney next asked Dr. McTague whether he had an opinion "based upon [his] evaluation" concerning the probability that appellant would commit more violent acts. McTague responded that predicting violence is "very difficult" and that "[b]ased on my test data I can only give a gross guess." The prosecutor went on to propose a hypothetical question asking that Dr. McTague "assume" that appellant had committed specific violent acts. McTague testified that research results indicate "the best predictor of future behavior is past behavior." Further, that if someone had committed the acts outlined by the State's Attorney in the hypothetical question, then there is a greater "likelihood they may do it again as opposed to not."

Thus, Dr. McTague stated that he could only give a "gross guess" as to the appellant's future potential for violence based upon his test data. The State's attorney did not inquire as to what that "gross guess" might be; rather, he asked McTague to assume that the evidence showed the appellant had committed certain violent acts, and then, "taking those [prior acts] into consideration," he asked if the doctor could express an opinion as to the probability of appellant's committing acts of violence in the future. The record clearly reflects that the doctor's response to this question was based upon the hypothetical facts he was asked to assume and his knowledge of research conducted within his field of expertise. The response did not purport to be based upon his evaluation of the test data obtained from appellant in September of 1975. Accordingly, we find that the Supreme Court's holding in *Estelle*

v. *Smith*, supra, is not applicable to the instant case. The testimony appellant has complained of in this ground of error was not admitted in violation of his Fifth Amendment right against self-incrimination.

■ Appellant also complains that Dr. McTague's testimony was inadmissible because the doctor did not personally interview the appellant. This contention has been addressed and rejected in *Barefoot v. State*, Tex.Cr.App., 596 S.W.2d 875 where we held:

> "The trial court did not err by permitting the doctors to testify on the basis of the hypothetical question. The use of hypothetical questions in the examination of expert witnesses is a well established practice. 2 C. McCormick and R. Ray, Texas Evidence, Sec. 1402 (2d ed. 1956). That the experts had not examined appellant went to the weight of their testimony, not to its admissibility."

*Id.* at 887.

■ Finally, the appellant submits that Dr. McTague's testimony was inadmissible because his opinion did not have "a basis in science or profession as to be beyond the knowledge of the average layman." As hereinabove noted, Dr. McTague's testimony was based upon the hypothetical question and research conducted in his field of expertise. The appellant made no trial objection corresponding to the contention now raised for the first time on appeal. An error presented on appeal must be the same as the objection raised at trial. E.g., *Nelson v. State*, Tex.Cr.App., 607 S.W.2d 554; *Simpkins v. State*, Tex.Cr. App., 590 S.W.2d 129; *McIlveen v. State*, Tex.Cr.App., 559 S.W.2d 815. The error urged was not properly preserved for review. Appellant's second ground of error is overruled.

In his eighth ground of error appellant contends the court erred in admitting into evidence a bullet and hair samples taken therefrom. The bullet allegedly caused the victim's death. Appellant maintains the bullet was recovered as a result of information derived from an illegally obtained confession.

On the day of his arrest, April 12, 1975, appellant confessed orally and subsequently signed a written confession. At a prior trial of appellant for the instant offense the written confession was excluded from evidence while the oral confession was admitted. Neither confession was admitted in appellant's second trial. Appellant maintains that the testimony of the investigating officers establishes that the bullet was located as a result of an alleged illegally obtained confession and constitutes an inadmissible product of illegal State action.

Officer A. L. Morris, of the Amarillo Police Department, testified that he and fellow officers searched for the bullet on April 17. The search lasted approximately four hours and was unsuccessful. An area in the shape of a semi-circle with a radius three hundred feet from the body was then staked off and systematically searched with the aid of metal detectors. The bullet was recovered within the staked-off area after a three hour search on April 18.

The bullet was found by Officer James Smith of the Amarillo Police Department. Smith related that while sitting on the ground within the staked-off area, he observed the bullet lying on top of the ground. The bullet was two hundred and forty-eight feet from the victim's body in a northwesterly direction. Smith testified that he and fellow officers had conducted an experiment based upon statements made by appellant in an oral confession. The experiment was conducted in an effort to determine the location of the bullet at the scene of the offense. Independent of appellant's statement, Smith knew the location of the victim's body, the direction the victim's head was pointed at the time the body was found, the location of the entry and exit gunshot wounds to the victim's head, the victim's height and appellant's height. Further, it was shown that Smith knew the gunshot wound had dislodged an earring from the victim's ear and that he was aware of the direction from the victim in which the earring was found.

With regard to the assistance appellant's statement furnished in locating the bullet and conducting the experiment, Smith testified:

"Q. Have you not or is it not true that in your mind, based upon the information that Boydston gave you, [concerning appellant's oral confession] the bullet was found three to four feet from where it should have been?

"A. Well, you are talking about three to four feet in distance or—

"Q. No.

"A. —a path?

"Q. In an area.

"A. Yes.

"Q. Have you not—isn't it a fact also your opinion that you would not have had to have staked the area out nor used the metal detectors after your demonstration, you could have walked out in that area and found the bullet?

"A. As it turned out, yes.

"Q. In fact, is it not your opinion that if you had walked a straight line after that demonstration you would have found the bullet in 30 minutes?

"A. Probably would have."

■ The exclusionary rule bars admission of evidence obtained as a direct result of an illegal search or an illegal coercive interrogation. See *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962). Admission of evidence is barred under this rule only if recovery of such evidence is sufficiently connected with an illegal act:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"

*Id.* at 487–88, 83 S.Ct. at 417, 9 L.Ed.2d at 455, quoting R. Maguire, Evidence of Guilt 221 (1959).

Three commonly advanced exceptions to the exclusionary rule include the "independent source," "inevitable discovery," and "attenuation" doctrines. *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). See generally Annot. 43 A.L.R.3d 345; Maguire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule*, 55 J.Crim.L., Criminology, and Police Science, 307. In *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) the police violated an accused murderer's right to counsel by eliciting incriminatory statements and the location of the victim's body after the defendant had invoked his right to terminate interrogation pending consultation with his attorney. The Court sustained exclusion of the incriminatory statements, but suggested that evidence of the location of the victim's body might be admissible "on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited...." *Id.* at 406 n.12, 97 S.Ct. at 1243 n. 12, 51 L.Ed.2d at 441 n.12.

While not denominating our rationale "the doctrine of inevitable discovery," this Court has previously applied the principle to testimony of witnesses whose discovery was imminent absent illegal State action. See *Ex Parte Parker*, Tex.Cr.App., 485 S.W.2d 585, *aff'd on other grounds, Parker v. Estelle*, 498 F.2d 625, *cert. denied*, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975) (unreasonable to believe witness would not have been discovered absent defendant's statement); *Santiago v. State*, Tex.Cr.App., 444 S.W.2d 758 (witness would have been discovered and testimony obtained without illegally obtained confession). We have also sustained the admission of identification testimony that "would have been obtained regardless by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint." *Johnson v. State*, Tex.Cr.App., 496 S.W.2d 72.

In *McMahon v. State*, Tex.Cr.App., 582 S.W.2d 786, *cert. denied*, 444 U.S. 919, 100

S.Ct. 238, 62 L.Ed.2d 175 (1979), an appellant argued that the fruits of an involuntary confession should have been excluded from evidence. Rejecting his contention we observed that, even if the confession was obtained illegally, the evidence would have been obtained by means sufficiently distinguishable from such confession to purge any taint. See *id.* at 789.

In *Noble v. State*, Tex.Cr.App., 478 S.W.2d 83 the Court reviewed a conviction for robbery by assault with a deadly weapon in which the trial court admitted physical evidence recovered as a result of statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. After noting "there was no showing that these items would have been obtained regardless by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint" we reversed the conviction. Accord, *Pitts v. State*, Tex.Cr.App., 614 S.W.2d 142 (no showing that physical evidence would have been discovered absent illegally obtained confession); cf. *Nicholas v. State*, Tex.Cr. App., 502 S.W.2d 169, 172–73 (no showing complaining witness would have been discovered absent illegal search).

■ In the instant case, the record reveals that independent of appellant's statement, officers had a great deal of information concerning the location of the victim at the time she was shot. The bullet was ultimately discovered while Smith sat on the ground smoking a cigarette. Six to eight officers searched the semi-circle with a three hundred foot radius for seven hours before the bullet was found. Finally, it was Smith's opinion that had he relied solely upon appellant's statement, the bullet could have been found in thirty minutes without the aid of metal detectors or the necessity of staking off the area. We conclude that the record supports the court's finding that the bullet would have been recovered regardless of the information furnished by appellant's oral confession. No error is shown in the admission of the bullet into evidence.

■ In his seventh ground of error appellant contends the trial court committed reversible error in admitting certain testimony of Ronald D. Richardson, a firearms identification expert. Appellant maintains that Richardson's testimony based upon information obtained through a computer constituted inadmissible hearsay evidence and violated his constitutional right to confront a witness against him.

The evidence complained of was apparently offered by the State to show that the bullet which caused Katina Moyer's death was fired by a handgun as alleged in the indictment—more specifically, a Smith & Wesson revolver. Richardson testified that he measured the width of striae imprinted upon the projectile by the rifling of the weapon from which it was fired. This data as well as the direction of twist of the rifling was subsequently entered into the Criminalistics Laboratory Information System (C.L.I.S.)—a computer system operated by the Federal Bureau of Investigation. Based upon this data input, the computer produced a printout listing weapons which could have fired the projectile in question. The list reflected all weapons catalogued in the computer's data base with rifling characteristics that would produce striae of the dimensions found on the bullet in question. The list received by Richardson indicated that the bullet in evidence was fired by a Smith & Wesson revolver.

Appellant's timely objection that Richardson's testimony repeating information obtained from a computer constituted hearsay and violated his right to confront all witnesses against him was overruled by the trial court. The State contends the use of the computer by Richardson was equivalent to referring to a recognized reference work, text, or treatise.

In *Gassett v. State*, Tex.Cr.App., 532 S.W.2d 328, a State's witness gave oral testimony concerning the contents of an N.C. I.C. (National Criminal Information Center) computer printout showing no prior arrest record for an individual. We held that the testimony constituted common law hearsay and, as presented, did not fall within the

"business records" exception to the hearsay rule.

Richardson did not purport to be giving an expert opinion based *in part* upon sources customarily used and relied upon by experts in ballistics and firearms identification. Cf., e.g., *Lewis v. Southmore Savings Association*, 480 S.W.2d 180, 186 (Tex.1972) ("An expert, when qualified as such, may give his opinion and relate sources which are customarily and usually relied upon by experts in the field upon which he *partially* relied in forming his opinion, together with his own personal knowledge, which support or tend to support that opinion.") (citations omitted) (emphasis added). Richardson simply stated the contents of the computer printout he received in response to his data input. Accordingly, his testimony, as presented, was hearsay evidence and does not fall within any recognized exception to the hearsay rule. See, e.g., *Gassett v. State*, supra; *Grissom v. State*, 119 Tex. Cr.R. 494, 43 S.W.2d 580 (testimony that books taught that flies carry typhoid fever germs was hearsay and should not have been admitted); *Ward v. State*, 70 Tex. Cr.R. 393, 159 S.W. 272 (medical books not admissible to show catgut was improper suture for wound); *Montgomery v. State*, 68 Tex.Cr.R. 78, 151 S.W. 813 (chapter from standard medical work on mental and nervous diseases held inadmissible on issue of sanity); *Aldenhoven v. State*, 42 Tex.Cr.R. 6, 56 S.W. 914 (doctor's testimony based on "Polk's Medical Register" not admissible); *Wright v. State*, Tex.Cr.App., 44 S.W. 513 (book "Materia Medica and Theraputics" not admissible to show alcoholic content of beer); *Burt v. State*, 38 Tex.Cr.R. 397, 40 S.W. 1000 ("Medical books cannot be introduced in evidence, nor can an expert witness be permitted to testify as to statements made therein."). Concomittantly, appellant was denied his constitutional right to confront all witnesses against him. U.S.Const. Amend. VI. See generally R. Ray, Texas Law of Evidence Secs. 781, 782, & 790 (Texas Practice 3d ed. 1980).

■ Having determined that the trial court erred in admitting Richardson's reci-tation of the information produced by the computer, we must determine whether the error requires reversal. Whether the improper admission of hearsay evidence requires the reversal of a conviction is determined on a case-by-case basis. See, e.g., *Wilder v. State*, Tex.Cr.App., 583 S.W.2d 349; *Torres v. State*, Tex.Cr.App., 552 S.W.2d 821; *Dalton v. State*, Tex.Cr.App., 516 S.W.2d 937. The duty of this Court is to determine from the record the probable impact of the erroneously admitted testimony upon "the minds of an average jury." *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Wilder v. State*, supra. Unless we find a reasonable possibility that the improperly admitted evidence contributed to appellant's conviction, reversal is not required. *Schneble v. Florida*, supra; *Wilder v. State*, supra. If we conclude "that the 'minds of an average jury' would not have found the State's case *significantly less persuasive ...*" had the testimony now at issue been excluded, we need not reverse. *Schneble v. Florida*, supra (emphasis added).

■ On direct examination, Richardson testified that the information he obtained from the computer was limited to a comparison of the data he entered with "the weapons that [were] in the data base ..." of the C.L.I.S. computer system. In other words, the measurements from the projectile in evidence were not compared with weapons that had not been tested, catalogued, and entered into the computer system's data base. The jury heard no evidence concerning the scope of the data base. Thus, the testimony based upon computer analysis did not purport to be conclusive.

Assuming arguendo that the jury believed the evidence complained of and that all inferences they drew therefrom were most unfavorable to the appellant, the most damaging effect the improper evidence could have had was to show that the bullet which caused Katina Moyer's death was fired from a Smith & Wesson revolver. Richardson did not testify that the bullet recovered was fired from any particular

gun, nor even any particular model of Smith & Wesson. The extent of his testimony was that the only weapons catalogued in the C.L.I.S. computer system capable of firing the bullet in evidence were Smith & Wesson revolvers. On cross-examination Richardson testified that there could be "literally millions" of guns made by Smith & Wesson in the United States—"maybe more."

Even if the jury accepted Richardson's testimony as fact, we do not find that inconclusive evidence tending to show that the bullet which caused the victim's death was fired from a Smith & Wesson revolver—one of "literally millions . . . maybe more—" constitutes evidence of sufficient probative value that, absent such testimony, an "average jury" would have found the State's case "significantly less persuasive." We find the trial court's error in admitting the testimony at issue harmless beyond a reasonable doubt. Cf. *Wilder v. State*, supra; *Ferguson v. State*, Tex.Cr.App., 573 S.W.2d 516; *Daniels v. State*, Tex.Cr.App., 573 S.W.2d 21; *Smith v. State*, Tex.Cr.App., 557 S.W.2d 299; *Haynes v. State*, Tex.Cr. App., 482 S.W.2d 191. Appellant's seventh ground of error is overruled.

In his fifth ground of error the appellant contends that the trial court erroneously excluded for cause two veniremen in violation of *Witherspoon v. Illinois*, 391 U.S. 510; 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

During the voir dire examination of Beatrice Sells the following colloquy occurred:

"Q. [By State's Attorney] Those are the only two possible punishments for the offense of capital murder. Okay?

"A. Yes.

"Q. Now bearing that in mind, do you have any conscientious or religious or moral scruples against the death penalty as a punishment for the offense of capital murder in the proper case?

"A. Well, I don't believe in the death punishment.

"Q. All right. That is fine. Are you saying that you have deep-seated feelings that would prevent you from rendering the death penalty in any case no matter what the facts are?

"A. Yes. I just don't believe in death."

The prosecutor then further explained the bifurcated system of trial and the special issues submitted at the second phase in the event of a jury finding of guilt. The following dialogue then occurred:

"Q. Now bearing this in mind, that if you answer both of those questions yes the defendant will be put to death, is it your feeling that no matter what the evidence was that was presented in helping you to answer these two questions, that you could not answer them both yes because you would know he would be sentenced to die?

"A. Yes.

"Q. You could not do that?

"A. No.

"Q. All right. Let me put that another way, if I may. Are you telling this Court and us in all candor—your only obligation here is to be truthful—that even if the evidence from an objective standpoint clearly showed that these questions should be objectively answered yes, you couldn't do that because you would know the man would be sentenced to die?

"A. I don't think I could.

"Q. You don't think you could answer those?

"A. No.

"Q. No matter what the evidence shows?

"A. No, I don't think I could, you know.

"Q. Your conscience and moral scruples would prevent you from participating in that exercise?

"A. Yes.

"Q. That is your most truthful answer to that question?

"A. Yes."

In response to questions by the appellant's counsel, Sells stated that she had "always felt that way about the death penalty," and when asked if she could set aside her personal beliefs and follow the court's charge she responded "I don't really—I don't think I could." The following dia-

logue occurred during further examination by defense counsel:

"Q. Can you conceive in your own mind, Mrs. Sells, of a set of circumstances or a set of facts in a capital murder case that were so bad, you know, no matter how horrible they were, so bad in your own mind that you could answer those two questions yes?

"A. I don't think. I don't think I could—I don't know.

"Q. Yes, ma'am. It is decidedly difficult.

"A. Yes, it is just a hard question—

"Q. Yes, ma'am.

"A. —to say whether I could or not because I don't know if I really could.

"Q. Well Mrs. Sells, would you automatically, no matter how bad the evidence was, just no matter how horrible the evidence was, would you automatically vote no to one or more of those questions just so you could satisfy yourself that the death penalty would not be imposed?

"A. I don't know. I don't really know what to say because, like I say, I don't believe in the death penalty—

" . . .

"Q. Well Mrs. Sells, it is awfully difficult for you and it is difficult for us, but isn't it true that you can conceive and you can imagine in your mind a fact situation in which you would answer both of those special issues yes, knowing that the person would receive the death penalty?

"A. I couldn't say. I couldn't say whether I could say he is guilty or not guilty.

"Q. Yes, ma'am. And you understand that this would be in the punishment stage of the trial?

"A. Yeah, I know.

"Q. After you already had found him guilty of the offense of capital murder?

"A. Um hum.

"Q. You could follow the Court's instructions, could you not, Mrs. Sells?

"A. (Nodding head)

"Q. You could set your own personal feelings aside, could you not, and answer those questions based upon the law and the evidence?

"A. (Nodding head)

"Q. You will have to answer that yes or no.

"A. Yes, I guess I could, you know. "MR. KOLIUS: All right. We will submit she is a qualified juror."

The State's Attorney then reexamined Mrs. Sells and elicited the following:

"Q. Now again, just assume that the evidence is such that there is no doubt in your mind objectively that the answer to both those questions is yes, in an objective sense. Could you vote with the rest of the jurors to return a verdict answering those questions yes, knowing that the defendant would therefore be sentenced to die?

"A. I don't think I could answer it yes and knowing that he would be sentenced to die.

"A. Are you saying that you could not answer the questions yes?

"A. No.

"Q. Ma'am?

"A. No, I couldn't answer the questions yes.

"Q. No matter what the evidence showed?

"A. (Shaking head)

"Q. May I have a verbal response?

"A. I couldn't say yes. I don't think I could say yes.

"Q. When you say yes you are talking about yes to the answer to the question?

"A. I couldn't say yes to the answers to the questions.

"Q. You could not do that?

"A. (Shaking head)

"Q. And again, is that your frank and honest answer?

"A. Yes.

"Q. Ma'am?

"A. Yes, it is."

Finally upon reexamination by defense counsel the following occurred:

"Q. Do you understand my question? You would be qualified if you could set aside or make subservient your feelings to the Court's instructions. Now my question simply is this. Imagine a case, Mrs. Sells, whatever you want to imagine, imagine the evidence so strong that it is just completely overwhelming. Imagine that, if you will. Then let me ask you, could you follow the Court's charge and set aside your own feelings concerning the death penalty and in that hypothetical case agree and answer those questions yes knowing that the person would be given the death penalty?

"A. No, I couldn't, not knowing he is getting the death penalty. I don't know if I could just set my feelings aside saying I am going to condemn this person to death and I will be the one that condemns him to death.

"Q. Are you telling me that regardless of the evidence then—

"A. I don't know if I can do it. I don't know if I can do it. I don't know. I don't really know."

The State's challenge for cause was granted over appellant's objection.

The appellant also contends that the trial court erred in granting the State's challenge for cause as to venireman Lilly West. In response to questioning by the State's Attorney, Mrs. West stated that she did not believe in the death penalty. The following colloquy then occurred:

"Q. Now this feeling you have about the death penalty, is that a deep-seated, deeply held feeling of yours?

"A. It is religious. And I just don't—

"Q. It is just based in large part upon your religious beliefs?

"A. Yes.

"Q. And is that a very deeply held belief of yours?

"A. Um hum.

"Q. I mean it is not just some scurrilous thing that you just believe off the top of your head?

"A. That is right.

"Q. It is fundamental to you?

"A. Yes sir."

The prosecutor then explained the bifurcated trial and the submission of special issues prescribed by Art. 37.071, V.A.C.C.P. before continuing:

"Q. Bearing in mind that if the jury answers both of the questions yes the defendant will be put to death, is it your feeling that no matter what evidence was presented, whatever evidence was presented to help you in answering those two questions, that you could not answer both of them yes because you could not participate in a proceeding that would result in the death sentence?

"A. That is right.

"Q. There is no conceivable set of facts and circumstances which I as attorney for the State could present to you that could lead you to answer both those questions yes?

"A. I really couldn't answer them yes, both of them, I don't believe.

"Q. Well, I appreciate your feelings. And nobody is being critical. We are just trying to find out—you have told us what your feeling is. What we are trying to find out is how deeply held that feeling is and whether or not that feeling would prevent you from objectively viewing the evidence and being able to return a verdict based on the evidence, you see?

"A. Yes sir.

"Q. And as I understand what you just told me, under no circumstances could you personally answer those questions yes, both of them yes—

"A. That is right.

"Q. —because you would know that the death penalty would be imposed.

"A. Yes sir.

"Q. And your feelings about the death penalty would just prevent you from being able to participate in that type of a proceeding?

"A. Yes sir.

"Q. Mrs. West, is there anything that I could do to change that feeling of yours?

"A. I don't think there is anything anyone can do.

"Q. Do you think there is anything Mr. Storrs and Mr. Kolius could do or say that would change your feeling about that?

"A. No sir.

"Q. Is there anything this Judge could tell you?

"A. No sir.

"Q. Have you ever at any time in your life believed in the death penalty?

"A. No sir, I haven't."

During subsequent questioning by defense counsel, Mrs. West began to equivocate. Defense counsel emphasized that the jurors do not sentence the accused, but are only required to answer the special issues. Further, the defense attorney advised her that "the only oath the jury would take would be to follow the Court's charge and to answer those questions...." The following colloquy ensued:

"Q. Now with that in mind, do you think that you would be able to sit on a jury, Mrs. West, and answer the questions that would be propounded to you, those two questions that would be propounded to you, just from the evidence and lay aside any feelings, personal feelings that you may have concerning the death penalty?

"A. Yes sir.

"Q. Really, that is all the Court is asking that you be able to do. Understand?

"A. (Nodding head)

"Q. And you could consider all the evidence, could you not—

"A. Yes sir.

"Q. —that was presented? And you could follow the Court's charge if you were under oath? The Court says, hey, if you take an oath you have got to follow the charge. I'm sure you would have no problems in following the charge, would you?

"A. No sir.

"Q. Okay. And you could answer those questions based on the evidence that

both sides would present to you, isn't that correct?

"A. Yes sir.

"Q. And in the event you were chosen as a juror, Mrs. West, would you tell us now that you would base your answers to those questions strictly on the evidence that was presented to you under the instructions of the Court?

"A. To the best of my ability."

The State's Attorney then reexamined Mrs. West whereupon she reiterated that she did not believe in the death penalty. The following transpired:

"Q. ... Is there any set of facts and circumstances I could put before you under which you could find the answer to those questions to be yes, both of them, knowing that that would result in an individual, a human being, being sentenced to die?

"A. I might say yes to one and no to the other, but—

"Q. But there is no way you could answer them both yes?

"A. I don't believe I could.

"Q. That is because you could not participate in a procedure that would result in a human being being sentenced to die. Is that right?

"A. That is right.

"Q. If the answer to them was no, you could answer that based on the evidence, couldn't you?

"A. Yes.

"Q. Because that wouldn't involve the imposition of the death penalty.

"A. (Nodding head)

"Q. But if the evidence showed the answer to both should be yes beyond a reasonable doubt, you still could not answer both of them yes. Is that right?

"A. I don't believe I could."

Defense counsel's final effort to rehabilitate Mrs. West elicited the following:

"Q. (By Mr. Kolius) Mrs. West, have you ever imagined or have you ever heard of a set of facts, you know, on the TV or radio or anything like that of a crime, let's just

say a murder case, where you thought that the death penalty was the appropriate penalty?

"A. No sir.

"Q. You could not conceive of a set of facts in your own mind—

"A. No sir.

"Q. —where you would think that the death penalty is the appropriate penalty?

"A. No sir.

"MR. KOLIUS: We pass the venireman."

The State's challenge for cause was granted over defense objection.

■ *Witherspoon v. Illinois*, supra, does not require specific formalized answers by prospective jurors. See, e.g., *Brandon v. State*, Tex.Cr.App., 599 S.W.2d 567, *Villarreal v. State*, Tex.Cr.App., 576 S.W.2d 51, *cert. denied*, 44 U.S. 885, 100 S.Ct. 176, 62 L.Ed.2d 114 (1979). Addressing problems associated with an "equivocating venireman" in *Tezeno v. State*, Tex.Cr.App., 484 S.W.2d 374, we stated:

"We cannot believe that *Witherspoon v. Illinois*, supra, requires certain formal answers and none other. We surely feel that the test of *Witherspoon* is 'not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality.'"

*Id.* at 383 (quoting from *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469).

In *White v. State*, Tex.Cr.App., 543 S.W.2d 104, *cert. denied*, 430 U.S. 988, 97 S.Ct. 1689, 52 L.Ed.2d 384 (1977), a prospective juror responding to questions concerning her ability to vote for infliction of the death penalty equivocated with the following answers:

(1) "I am not sure. I think I believe in it [the death penalty], but I am not sure that I could carry it out."

(2) "I think so."

(3) "I just really don't know."

(4) "I don't think so."

In that case we concluded:

"In the light of the 'cold' record before us, it would be difficult to say whether

venireman Barbour unequivocally stated that she would automatically vote against imposition of the death penalty; however, when she was faced with the question of whether she could take an active part as a juror in the consideration and assessment of the death penalty in a given case, she responded that she did not 'think so.' Her answer was tantamount to a declaration that her personal qualms about the imposition of the death penalty would prevent her from being an impartial juror in a case in which the range of punishment included the death penalty."

*Id.* at 108; accord, *Villarreal v. State*, supra; *Hughes v. State*, Tex.Cr.App., 563 S.W.2d 581, *cert. denied*, 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979); see *Garcia v. State*, Tex.Cr.App., 581 S.W.2d 168; *Granviel v. State*, Tex.Cr.App., 552 S.W.2d 107, *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977).

■ After reviewing the equivocal answers given by these two veniremen during voir dire examination, we are unable to hold that the trial court committed error in granting the State's challenges for cause. We find the following language from *Hughes v. State*, supra, applicable to the trial court's ruling with regard to both of these prospective jurors:

"We must be mindful that where we only have a cold record before us the trial judge in passing on the answers of the 'equivocating venireman' has the opportunity to observe the tone of voice and demeanor of the prospective juror in determining the precise meaning intended. *Tezeno v. State*, supra. While her examination was concluded by the answer, 'I can't say,' and 'I just don't know,' in response to questions about automatically voting against the death penalty, her earlier answer to questions left no doubt that she could not vote to inflict the death penalty however horrible the circumstances of the case might be."

*Hughes v. State*, supra, at 585–86. We find no error in the trial court's exclusion of these veniremen. See *Garcia v. State*, supra; *Villarreal v. State*, supra; *Hughes v.*

*State,* supra; *Granviel v. State,* supra; *White v. State,* supra; *Tezeno v. State,* supra. Appellant's fifth ground of error is overruled.

██ In his sixth ground of error appellant contends the trial court erred in sustaining the State's objection to a question defense counsel asked of prospective jurors Sells and West. During voir dire examination the appellant's counsel asked both of these veniremen whether they would violate their oaths as jurors and answer "no" to one of the special issues submitted at the punishment phase even though they believed beyond a reasonable doubt that the answer should be "yes." The trial court sustained the State's objection and disallowed the question. The appellant maintains that the question was proper pursuant to the Supreme Court's opinion in *Witherspoon v. Illinois,* supra, and that the trial court's action deprived him of his right to fully examine the prospective jurors.

It is clear from the record that the question was propounded by defense counsel as part of his attempt to rehabilitate the prospective jurors in the face of the State's challenges for cause. The record demonstrates that defense counsel was given ample opportunity to inquire into the attitudes and beliefs of the veniremen pertinent to their qualification under *Witherspoon.* The only limitation imposed upon his examination of these veniremen was the court's action in not allowing direct inquiry into whether the prospective jurors intended to violate their oath.

Apparently the defense attorney was referring to the oath required by Art. 35.22, V.A.C.C.P. That Article provides:

"When the jury has been selected, the following oath shall be administered them by the court or under its direction: 'You and each of you do solemnly swear that in the case of the State of Texas against the defendant, you will a true verdict render according to the law and the evidence, so help you God.' "

This oath is administered after the jury is selected. See Onion, *Special Commentary,* Art. 35.22, V.A.C.C.P. There is nothing in the instant record showing that either of these prospective jurors were familiar with the provisions of Art. 35.22 when defense counsel asked them if they intended to violate their oaths. Absent a showing that they were aware of the content of the oath, the question was clearly improper and there was no error in prohibiting such a query.

Further, we find it difficult to imagine circumstances under which prospective jurors would state that they intended to violate their oaths as jurors. It is reasonable to assume that veniremen would equate violating an oath with violating the law or failing to discharge their duty as a citizen despite the fact that they had been admonished by counsel that they had the right to disagree with the law providing for the death penalty.

██ Lastly, even if the question was improperly disallowed we fail to see how appellant was harmed. We are unable to conceive of a possible answer to the question that would persuade us to find the trial court's exclusion of these prospective jurors erroneous. Had they answered in the affirmative—that they intended to violate their oaths—this would have supported the court's ruling on the challenges for cause. Had they answered "no" or "I don't know," their responses would have constituted further equivocation on the *Witherspoon* issue in light of their previous responses. Accordingly, in view of our disposition of appellant's fifth ground of error, supra, we find no error in the trial court's disallowing the question at issue. Appellant's sixth ground of error is overruled.

We find no reversible error; the judgment is affirmed.

ROBERTS, CLINTON and TEAGUE, JJ., dissent.

McCORMICK, J., not participating.