NUMBER 13-03-028-CR

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

GAYLE KING,                                                          Appellant,

 

                                           v.

 

THE
STATE OF TEXAS,                                              Appellee.

 

 

 

                  On appeal from the 206th
 District Court

                           of Hidalgo
County, Texas.

 

 

 

                              O P I N I O N

 

              Before Justices Rodriguez,
Castillo and Garza

                           Opinion by Justice Castillo

 








A jury convicted appellant Gayle King of two counts
of promoting a pyramid promotional scheme[1]
and one count of theft by deception.[2]  The jury acquitted her of five other indicted
charges.  The trial court sentenced King
to three concurrent sentences of two years in a State Jail facility, probated
for five years, imposed a fine, and ordered restitution.  King raises eight issues on appeal.  We affirm.

I.  BACKGROUND

In late 2000, a program referred to as Women Helping
Women ("WHW"), Original Dinner Partyr ("ODP"), or
"birthday club" became popular as a "gifting club."  Women who wished to join WHW would pay $5,000
for a "plate," designated as a "gift," with the expectation
that their $5,000 gift would be returned to them, multiplied, as other women
joined the club and paid the $5,000 gift.[3]  King's adverse jury verdict rested on two
counts of a pyramid promotional scheme and one count of theft.  

II.  ISSUES
PRESENTED








By her eight issues, King complains:  (1) the trial court reversibly erred in
denying her requested jury charge instruction on a defensive issue; (2)
restitution is unsupported in law or fact; (3) section 17.461 of the Texas
Business and Commerce Code is unconstitutional; (4) the evidence is legally
insufficient; (5) prosecution was selective; (6) the jury charge omitted a
requisite knowledge element; (7) the double jeopardy clause barred the
punishment assessed; and (8) her motion for new trial should have been granted.

III.  LEGAL
SUFFICIENCY

By her fourth issue, King asserts that the evidence
is legally insufficient to prove the essential elements of (1) a pyramid scheme
in Counts 1 and 2, and (2) theft in Count 5. 
The State counters that the evidence is sufficient to sustain the
convictions.

A.  Legal
Sufficiency Standard of Review








A legal‑sufficiency challenge requires us to
review the relevant evidence in the light most favorable to the verdict, and
then to determine whether a rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Escamilla v. State, 143 S.W.3d 814,
817 (Tex. Crim. App. 2004) (citing Jackson v. Virginia, 443 U.S. 307,
319 (1979)); see Swearingen v. State, 101 S.W.3d 89, 95 (Tex. Crim. App.
2003) (en banc); Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000)
(en banc).  This standard is designed to
give "full play to the [jury's] responsibility fairly" to "draw
reasonable inferences from basic facts to ultimate facts."  Sanders v. State, 119 S.W.3d 818, 820
(Tex. Crim. App. 2003).  We consider all
the evidence that sustains the conviction, whether properly or improperly
admitted.  Conner v. State, 67
S.W.3d 192, 197 (Tex. Crim. App. 2001) (citing Garcia v. State, 919
S.W.2d 370, 378 (Tex. Crim. App. 1994) (en banc)).  Similarly, we consider all the evidence that
sustains the conviction, whether submitted by the prosecution or the defense,
in determining the legal sufficiency of the evidence.  King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000) (en banc); Cook v. State, 858 S.W.2d 467, 470
(Tex. Crim. App. 1993) (en banc).  In
this review, we are not to reevaluate the weight and credibility of the
evidence; rather, we act only to ensure that the jury reached a rational decision.  Muniz v. State, 851 S.W.2d 238, 246
(Tex. Crim. App. 1993) (en banc). 

The legal sufficiency of the evidence is measured
against the elements of the offense as defined by a hypothetically correct jury
charge for the case.  Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997).[4]  This standard of legal sufficiency ensures
that a judgment of acquittal is reserved for those situations in which there is
an actual failure in the State's proof of the crime, rather than a mere error
in the jury charge submitted.  Id.  We then determine if any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson, 443 U.S. at 319; Johnson,
23 S.W.3d at 7.   








If we reverse a criminal case for legal
insufficiency, we reform the judgment of conviction to reflect conviction for a
lesser offense only if a jury charge on the lesser offense was either submitted
or requested, but denied.  Collier v.
State, 999 S.W.2d 779, 782 (Tex. Crim. App. 1999).  Otherwise, we vacate the judgment of
conviction for legal insufficiency and order a judgment of acquittal.  Swearingen, 101 S.W.3d at 95.  

B.  Pyramid
Promotional Scheme 

1.  The Law

"Pyramid promotional scheme" means a plan
or operation by which a person gives consideration for the opportunity to
receive compensation that is derived primarily from a person's introduction of
other persons to participate in the plan or operation, rather than from the
sale of a product by a person introduced into the plan or operation.  Tex.
Bus. & Com. Code
Ann. ' 17.461(a)(6) (Vernon 2002).  "Promoting a pyramid promotional
scheme" means (1) inducing or attempting to induce one or more other
persons to participate in a pyramid promotional scheme, or (2) assisting
another person in inducing or attempting to induce one or more other persons to
participate in a pyramid promotional scheme, including by providing references.  Tex.
Bus. & Com. Code
Ann. ' 17.461(a)(5)(A)-(B) (Vernon 2002).  "Compensation" means payment of
money, a financial benefit, or another thing of value.  Tex.
Bus. & Com. Code
Ann. ' 17.461(a)(1) (Vernon 2002).  The term does not include payment based on
the sale of a product to a person, including a participant, who purchases the
product for actual use or consumption.  Id.
 "Product" means a good, a
service, or intangible property of any kind. 
Tex. Bus. & Com. Code Ann. '
17.461(a)(4) (Vernon 2002). 








2.  The Record

Counts 1[5]
and 2[6]
charged King with a pyramid promotional scheme, alleged to have occurred,
respectively, on or about October 19, 2000, and November 2, 2001.

a.  The
State's Witnesses[7]








Sandra Garcia testified that, in late 2000, she
became involved with WHW after speaking with her friend, Bartolita Torres.  On October 19, 2000, she attended what she
thought was a WHW meeting at a residence. 
Instead, the event was a "gifting party," which Garcia
described as "several persons give money to one person and it comes out to
either 10 or 20,000."  King and two
other women received $20,000 in cash each. 
Garcia signed her name on a list which was passed around for attendees
who wished to participate in the future. 
From Garcia's perspective, King was in charge because she did most of
the talking.  Using a diagram on an easel
to demonstrate the process, King explained that $2,500 was for half a
"plate" and $5,000 for a whole "plate," and, "then as
people come in, you move out or up . . . til you get to the dessert plate and
that's when you party."[8]  From King's talk, Garcia understood that,
within four to six weeks, in return for $2,500 in cash, the person would
receive $10,000; similarly, for $5,000, the person would receive $20,000,
provided additional persons participated. 
Garcia testified, "We were told that we didn't have to take
anybody.  We didn't have to recruit
anybody because people were coming in on their own."  King said she had friends from San Antonio
and other people who "wanted to get in."  When a person paid in someone's name, the
"someone" would move from one level to the next.  Garcia recalled King stated that the money
could be used for college or bills but "not to deposit it at the bank
because of taxes."  At the October
19, 2000 gathering, Garcia saw her friend Bartolita Torres as "kind of
nervous.  She was taking her
money."  Garcia saw Torres give King
$5,000 in cash. 








On a later date, Garcia gave $2,500 she obtained
from her credit card.[9]  Garcia contacted King after concerns arose
about the program.  King assured her that
"it wasn't the same thing, that those were pyramids and this was not a
pyramid and it was legal . . . that the original dinner party had attorneys . .
. that they were speaking to."  At
two subsequent meetings, King and two other women said that the "tables
were not moving . . .  It was at a
standstill."  At the meetings, King
stated that she had to take a leave of absence from work to concentrate on the
program.  King encouraged the attendees
to "start bringing people in so that the tables could move and the plates
could move."  Garcia testified that
there were no products sold in order to recoup the $2,500 she gave.  Garcia never received any money in return for
her gift.

Ludivina Vega testified that in October 2000, she
attended a meeting at a residence involving a "club of women helping
women."  At the meeting, King told the
attendees that the club was to help people with their debt or college funds for
their children.  King stated that the
program was "legal . . . she had her attorneys in the case of
emergency."  King further stated
that the money need not be deposited in the bank "so we didn't have to pay
the IRS, for us not to be worried that it could be some kind of
fraud."  Vega's testimony regarding
the fees for the plates and the "gifting" mirrored Garcia's testimony.[10]  At one party, Vega saw Torres give
$2,500.  At another, Torres gave
$5,000.  After Vega gave $2,500 and
received nothing, she called King who told her she would give her the money in
December.  At a subsequent conversation,
King told her she would give Vega the money in January.  Vega never received any money.  








Enedelia Tijerina testified that, sometime in
October 2000, she became involved with WHW after King spoke with employees at
her work.  Tijerina understood that
"you gave some money and a few weeks later you birthday.  You got more money than what you put
in."  Tijerina added that
"$5,000 was a plate and you birthdayed and you got $20,000."[11]  King followed up with Tijerina by telephone
to see if she was interested in participating.  Because Tijerina did not understand how the
program worked, the two met later and King explained the program to show her
how it worked.  Tijerina joined the club
and gave money on October 19, 2000, at a party. 
King was in charge of the party, gave a presentation, and was the
"motivator."  King used
diagrams to show the "tables" and how the program worked.  On that date, Tijerina saw Torres give King
$5,000.  Tijerina recalled attending at
least four additional parties, one with about seventy women in attendance.  King was the "spokesperson" each
time and made the same presentation each time about "women helping
women."  At some point, King met
with Tijerina to assist her to dissuade Torres from pursuing charges or
"whatever she was going to do to get her money back."  King told her that, if Torres "proceeded
with this and if something happened that everybody at" Tijerina's work
would be "involved . . . if something was going to happen to [King], we
were all involved."  













The complainant, Bartolita Torres, testified that
King approached her co-workers and her at work on October 16, 2000, and
explained how the "dinner party" worked.  King explained the program and returned
another time to notify them about a party on October 19, 2000.  Torres attended and gave King $5,000, money
from her children's college education fund. 
King told her the money would be given to King's mother who was out of
town.  After attending additional
parties, four total, and learning that King, King's mother, and a pet belonging
to one of King's friends "birthdayed," Torres gave an additional
$2,500 at a November party, hoping to "birthday."[12]  At one party, King told the attendees that
"things had stopped" and they needed to recruit people.  King communicated with Torres by e-mail
because "we couldn't be calling them . . . that's what they told
us."  Once "things
stopped," Torres called King because she never received any money and
demanded her money back.  The following
February, King agreed to return her money, then later recanted.  On November 12, 2001, Torres spoke with King
again.  King had initiated the telephone
call.  King told her she would not be
returning the money on advice of her lawyers. 
Torres testified that the women did not have to buy products.  Torres testified that the persons she knew
"birthdayed" were King, King's dog, King's mother, and King's male
friend.

b.  The
Defense's Witnesses

Raul Balli testified that he knew King for many
years.  He told King he had heard about a
"women helping women club" from someone else.  King told him she knew about the club and was
involved.  Balli opted to participate by
giving $5,000 in his dog's name because the club was limited to women.  Ultimately, Balli received $20,000,
representing $5,000 he gave and $15,000 "gifted" to him.  Balli testified he participated because he
"wanted to make a little extra money . . . although it was risky, I still
went ahead and tried to make some money . . . . 
It was certainly a gamble." Balli testified:

Q:  Okay.  What was your understanding if you gave
$5,000 of what you were expecting in return?

 

A:  It was a
gamble.  I was very much aware of that
and that's why I signed that it was supposed to be a gift, but it was a good
chance that I could get money in return. 
And the lady friend from Brownsville emphasized that everybody was
making good on it.

 

Q:  But how much
money were you expecting to get in return? 
How much money were you told you were supposed to get?

 

A:  I believe
the amount that I got.

 

Q:  Which
would be the $20,000?

 

A:  They were
making $35,000 and they were making a goodBput in $5,000 and you were making $15,000 profit or
something like that.

 








Q:  So the total you got was $20,000?

 

A:  That is correct . . . .  So it was gambling.  I wasn't totally sure that I was going to get
the money back.

 

Q:  What was your understanding if this was a
gift?  Who were you giving it to?

 

A:  To that woman's club . . . to the women
participating in the club.

 

Q:  Did you know who that money was going to
directly?

 

A:  No, no.

 

Q:  Did you ever ask?

 

A:  Not really.

 

Balli admitted that he was an exception
because he participated in a club exclusively for women and he did not attend
any meetings or parties.

King testified on her
own behalf.  She denied intent,
culpability, and criminality of the program. 
She denied she invented, prepared, contrived or established the gifting
club.  She learned that the gifting club
originated in Canada.  From Austin, King
reached the five thousand participants in the county.  King attended the first meeting of WHW in
August of 2000.  There, she saw prominent
people in the community.  She learned the
gifting club was a way for women to support each other, secure scholarship
money, or help other women who were in trouble. 
Her role at subsequent  meetings
she attended was as a translator and not a speaker.  King testified as follows as to how the plan
worked:








Q:
And in order for the club to work, four people had to come in and bring in
$5,000 and there was a person who birthdayed out at $20,000; isn't that
correct?

 

A:  That is correct.

 

Q:  And if those individuals wanted to get
$20,000, then another four people would have to bring in $5,000 so they could
get $15,000 returned on their $5,000 investment; isn't that correct?

 

A:  That is right.

 

Q:  Okay. 
And so if they wanted to birthday out, more money needed to come in so
they could get their money; isn't that correct?

 

A:  That is correct.

 

Q:  Okay. 
And then people just moved up from level to level to level?

 

A:  And they got out.

 

Q:  But they moved up fromByou went in on the salad level, correct?

 

A:  Right. . . . 
A lot of people came in like Mr. Balli and other people and they got
their 20 and they left.

 

Q:  Right. 
And then they would move . . . up to the entree level, correct?

 

A:  Right.

 

Q:  And then they would move up to the dessert
level before they moved out, correct?

 

A:  The entree level was just nothing.  It was justBit was
nothing.  The four people at the bottom
gave to the one person at the top.

 

Q:  Right. 
But there was one level in between before you received your $20,000 or
your $10,000.

 

A:  Yeah, you didn't go from . . . the bottom to
an entree to the top.  It was directly
from the bottom to the top.

 








Q:  Right. 
And then once that person, as you say, left, then the entrees become
desserts?

 

A:  Right.

 

Q:  And then you would have new tables because
you would have to split, right?

 

A:  But each table was a separate entity . . . .

 

Q:  In other words, so whoever deserted could use
the money for whatever purpose they wanted?

 

A:  Exactly. . . . 

 

King admitted:  (1) she distributed documents for
"gifting" participants to sign; (2) she distributed and explained
diagrams of the "dinner tables" showing the three levels of gifting;
(3) she explained the club to women who were "going to those meetings and
they weren't understanding what they were doing"; and (4) her mother,
Balli, and she "birthdayed" out when each received $20,000.   Finally, King admitted that she forwarded
one and generated another e-mail regarding the club's activities.  Both e-mails were admitted in evidence.  The e-mail she wrote states:

From: Gayle King

To:
[Addressees]

Sent:
Saturday, September 23, 2000 8:34 AM

Subject:
FOR YOUR INFORMATION

 

Hi
Chicas,

 








Deldi
and I are going to speak at the meeting on Sunday at 217 Quail Court in the
North Garden Estates.  It is at 4:00
PM.  I will speak in Spanish also.  I would like for you to invite friends to
come and listen.  It is so important that
they come to a meeting before they decide to participate in the Original Dinner
Party.  The next step would be to invite
them to a birthday.  I will get times and
dates from Deldi.  Deldi is also going
[to] explain a strategy for 4 tables.  As
soon as Melinda birthdays we will implement it. 
SO CHICAS, LETS [sic] WORK HARD TO BIRTHDAY MELINDA!!!  Today I am going to go through all my
addresses and people I know, even people I may not know well that could use the
support of our group, even if they are not ready yet, it would still be a
wonderful experience to grow with us and feel the energy that we give each
other.  That is the spiritual birthday
gift we empower each other with.  I will
call each of you as well.  I will also
talk to Deldi about speaking at the meeting on Thursday also.  

 

I
am sending you each others phone numbers, the e-mails for ODP information etc.

 

[Names
and telephone numbers of seven women]

 

The
following are e-mail addresses to get information:

 

[E-mail
addresses for club updates, meeting times and places, speakers for meetings,
and volunteering to be trained as a monitor or speaker]

 

King forwarded another e-mail on October
25, 2000.  That e-mail reflects the time
and place for various meetings throughout October and November in various
locations, identifying hostesses and speakers for each site.

King's best friend,
Sandra Hamlin, testified that she attended one WHW meeting with King.  King told Hamlin that King had "to talk
to these women, that they are needing this explanation as to what this is, and
we are going to go on."  When asked
why she did not join the club, Hamlin testified, "Because I didn't believe
in it.  I made a choice not to get
involved with that."                      


3.  Pyramid Scheme Analysis








The hypothetically correct jury charge against which
we measure legal sufficiency in Count 1 of the indictment would ask the jury if
King: (1) on or about October 19, 2000;[13]
(2) intentionally and knowingly; (3) contrived, prepared, established,
operated, promoted, advertised and sold; (4) a pyramid promotional scheme; (5)
involving Bartolita Torres; (6) who paid $5,000 consideration for an
opportunity for compensation from other than the sale of a product.  For
Count 2, the hypothetically correct jury charge would contain the same elements
as alleged to have occurred on November 2, 2001, and involving $2,500
consideration.  

In the September 23,
2000 e-mail, King (1) invited women to attend a Sunday "Original Dinner
Party" where "strategy for 4 tables" would be addressed, (2)
stated she would be a speaker, (3) encouraged the women to invite friends to
attend the dinner "before they decide[d] to participate," (4)
informed women that the next step would be a "birthday," (5)
solicited women to work hard to "birthday" a participant, and (6)
volunteered to speak at a similar Thursday meeting.  On October 25, 2000, King forwarded an e-mail
to women notifying of the time and place of club meetings. 








Viewed in the light
most favorable to the verdict, additional evidence demonstrates that the
State's witnesses, including the complainant, joined a woman's club with a
"gifting" plan in place.  The
plan involved a gift of $2,500 for a return of $10,000 and $5,000 for a return
of $20,000, provided a sufficient number of women joined the club.  Each witness paid the requisite gift of
either $2,500 for half a plate or $5,000 for a full plate to enter the
"soup and salad" level of a table. 
Torres "gifted" $5,000 to King.  Later she "gifted" $2,500 to King's
mother through King.  According to each
State's witness, she was invited and/or encouraged to join the club by King,
either through King's personal contact or her motivational talks at the
meetings attended.  Club members were
requested to invite and secure other women to participate in the plan.  Participants "birthdayed" at the
"dessert level" after all the "plates" on the "dinner
tables" were paid.  King, her
mother, her friend Balli, and Balli's pet were "birthdayed."  The State's witnesses were not.  Return on the money gifted was not from the
sale of products.  By her e-mail and when
the plan reached a "stand still," King encouraged participants to
invite friends.  Upon non-receipt of a
return on the money she gifted, Torres requested her money back from King, but
the money was never returned.  Documents
in evidence demonstrate the three levels of plates on dinner tables.  King admitted distributing the documents and
explaining them and the plan at WHW meetings. 
King's e-mail, dated September 23, 2000, confirms a "strategy for 4
tables" would be discussed at the scheduled dinner party.  








We conclude that the
evidence demonstrates that the "gift" club was a plan by which a
person gave consideration for the opportunity to receive compensation that was
derived primarily from a person's introduction of other persons to participate
in the plan, rather than from the sale of a product by a person introduced into
the plan.  The evidence demonstrates that
King induced one or more other persons to participate in a pyramid promotional
scheme or assisted another person in inducing or attempting to induce one or
more other persons to participate in a pyramid promotional scheme.  Tex.
Bus. & Com. Code
Ann. ' 17.461(a)(6).  Thus, we conclude that a rational trier of
fact could have found beyond a reasonable doubt the essential elements of a
pyramid promotional scheme.  Tex. Bus.
& Com. Code Ann.
'
17.461(a)(5)(A)-(B).  We conclude the
evidence is legally sufficient.

C.  Theft by Deception

By her fourth issue,
King also asserts that the evidence is legally insufficient to prove she
committed theft by deception as alleged in Count 5 of the indictment.[14]  The State counters that the evidence is
sufficient.

1.  The Law








Count 5 of the
indictment charged King with theft of property by deception.  The hypothetically correct jury charge
against which we measure the sufficiency of the evidence would ask the jury if
King, (1) on or about October 19, 2000, (2) unlawfully, (3) appropriated
property, (4) with the intent to deprive the owner of the property.  Tex.
Pen. Code Ann. ' 31.03 (Vernon Supp.
2004-05); Thomason v. State, 892 S.W.2d 8, 10 (Tex. Crim. App. 1994) (en
banc).  "Appropriate" means to
bring about a transfer of title or other non‑possessory interest in
property or to acquire or otherwise exercise control over property.  See Tex.
Pen. Code Ann. ' 31.01(4) (Vernon
Supp. 2004-05).  The statute defines
three ways in which an appropriation is unlawful, including "without the
owner's effective consent."  Tex. Pen. Code Ann. ' 31.03(b)(1), ' 31.01(4); Stockman
v. State, 826 S.W.2d 627, 636 (Tex. App.BDallas 1992, pet. ref'd).  

Thus, the crucial
element of theft is the deprivation of property from the rightful owner,
without the owner's consent, regardless of whether the defendant at that moment
has taken possession of the property.  Stewart
v. State, 44 S.W.3d 582, 589 (Tex. Crim. App. 2001) (en banc).  Consent is not effective if induced by
deception or coercion.  Tex. Pen. Code Ann. ' 31.01(3)(A) (Vernon
Supp. 2004-05).  Penal Code section
31.01(1) contains five definitions of "deception."  Id. ' 31.01(1) (Vernon
Supp. 2004-05).  Deception means, among
other things, promising performance that is likely to affect the judgment of
another in the transaction and that the actor does not intend to perform or
knows will not be performed, except that failure to perform the promise in
issue without other evidence of intent or knowledge is not sufficient proof
that the actor did not intend to perform or knew the promise would not be
performed.  Id. ' 31.01(1)(E) (Vernon Supp.
2004-05).  "Deprive" means to
withhold property from the owner permanently.  Tex. Pen. Code Ann. ' 31.01(2)(C) (Vernon
Supp. 2004-05).  The intent to deprive is
determined from the words and acts of the accused.  Griffin v. State, 614 S.W.2d 155, 159
(Tex. Crim. App. 1981); Roberson v. State, 821 S.W.2d 446, 448 (Tex.
App.BCorpus Christi 1991,
pet. ref'd).  

2.  The Record

King focuses her
argument on a document admitted in evidence. 
The document signed by the complainant Torres on October 19, 2000,
states:








This money is a gift ($5,000) and is freely given
to Checa K without consideration.  All
taxes have been paid on this money and I have not been coerced in any way or by
anyone to give this money.

 

This money is strictly a gift and I expect
nothing in return from the person I am gifting.

 

King
argues that the document demonstrates that the $5,000 was Torres' gift to
King's mother without any expectation of return, and thus the evidence negates
the essential elements of the offense of theft. 
King admitted that she returned money to another participant who did not
"birthday."  She further
admitted that she did not really know the women involved in the plan.  When the prosecutor asked why Torres would
give $5,000 to someone she really did not know without expecting something in
return, King answered, "We were all in the same thing together.  We all came in for the same reason and the
same way."  King explained that the
plan was part of giving back to the community, including assisting an orphanage
in Mexico and helping women.  King's
witnesses, Hamlin and Balli, unequivocally testified that participation in the
plan was a gamble, a risk.  Hamlin did
not assume the risk.  Balli did and
received a return.  Balli further
testified that he signed a document, indicating that his $5,000 was a
gift.  However, he did not know who he
was helping.  Balli did not attend
meetings.  The record does not establish
that he was asked to invite friends to participate in the plan, as King
encouraged in her e-mail.








Viewed in the light
most favorable to the verdict under the Jackson standard, the evidence
shows that King touted the success of the plan to women both by personal
contact and by speaking at WHW gatherings, whether dinner parties or
meetings.  The State's witnesses
uniformly testified that King represented that they need not
"recruit" participants because people as far away as San Antonio were
lined up to participate in the plan. 
King's e-mail confirms she would be contacting people "I know, even
people I may not know well."  When
the plan reached a "standstill," however, and women had gifted, King
encouraged the participants to bring others, stating at one point that she had
taken a leave of absence from work to concentrate on the plan.  

The State's witnesses
testified they saw Torres give King $5,000 in cash on October 19, 2000.  King's mother was not present.  King admitted she provided Torres the
document to sign.  Torres testified that
she did not read the document before signing it.  King admitted that she explained the plan to
participants because they did not know what they were doing.  King's mother "birthdayed,"
receiving $20,000.  Torres did not.  Torres testified that she expected that her
$5,000 would multiply to $20,000.  When
that did not occur, Torres requested that King return the money.  King refused. 
King testified that, although the return was not effected, she agreed to
return the money to Torres because King "felt responsible for her
mother."

3.  Theft By Deception Analysis








Torres attended a
party on October 19, 2000, and delivered $5,000 in cash to King.  Torres unequivocally testified that she
expected a return of her $5,000, multiplied, based on King's
representations.  King, her mother, and
her friend Balli "birthdayed," receiving $20,000 in return for their
$5,000 "gift."  King "birthdayed"
at the October 19, 2000 meeting.  The
gifts of King and persons related to or acquainted with her resulted in a
return of their gifts.  King made an
exception to the all women rule for Balli by using his female pet's name as the
participant.  Torres and the State's
witnesses complied with the terms of their gifts, including recruitment, expecting
a return that did not materialize.    








The legal sufficiency
standard of review is meant to give "full play to the [jury's]
responsibility fairly" to "draw reasonable inferences from basic
facts to ultimate facts."  Sanders,
119 S.W.3d at 820; Griffin, 614 S.W.2d at 159.  We consider all the evidence that sustains
the conviction, whether properly or improperly admitted.  Conner, 67 S.W.3d at 197 (citing Garcia,
919 S.W.2d at 378); see Moff v. State, 131 S.W.3d 485, 489‑90
(Tex. Crim. App. 2004).  Similarly, we
consider all the evidence that sustains the conviction, whether submitted by
the prosecution or the defense, in determining the legal sufficiency of the
evidence.  King, 29 S.W.3d at 562;
Cook, 858 S.W.2d at 470.  In this
review, we are not to reevaluate the weight and credibility of the evidence,
but rather, we act only to ensure that the jury reached a rational
decision.  Muniz, 851 S.W.2d at
246.  The standard of review is the same
in both direct and circumstantial evidence cases.  Kutzner v. State, 994 S.W.2d 180, 184
(Tex. Crim. App. 1999).  We are mindful
that every fact need not point directly and independently to the accused's
guilt.  Vanderbilt v. State, 629
S.W.2d 709, 716 (Tex. Crim. App. 1981). 
A conclusion of guilt can rest on the combined and cumulative force of
all the incriminating circumstances.  Id.;
Beardsley v. State, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987) (en
banc).               

In this case, the
ultimate facts in question were (1) appropriation of the currency  and (2) the specific intent to deprive the
owner of it by deception.  A jury may
infer intent from any facts which tend to prove its existence, including the
method of committing the crime.  See
Manrique v. State, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (en
banc).  The evidence demonstrates that
King knew that the plate plan could not, would not, and did not work without
regular recruitment of women with $2,500 to $5,000 to gift.  A return on Torres' $5,000 was contingent
upon continued recruitment of women with $2,500 to $5,000 to gift.  The jury could have reasonably inferred that
King's representation that people were lined up for the program coupled with
the promise of a return likely affected the judgment of Torres.  Indeed, when she did not receive a return on
her $5,000, while aware that King, King's mother and friend
"birthdayed," Torres gifted an additional $2,500 as an added effort
to "birthday." 








On this record, we
cannot say that a jury would have unfairly or irrationally inferred that King
appropriated the property with the specific intent to deprive Torres, the
owner, of it by deception.  See
Sanders, 119 S.W.3d at 821; see also Griffin, 614 S.W.2d at
159.  We assume that the jury resolved
conflicts in testimony, weighed the evidence, and drew reasonable inferences in
the manner that supports the verdict.  Griffin,
614 S.W.2d at 159.  Thus, viewing the
evidence in the light most favorable to the verdict and measuring it against
the essential elements of theft by deception as defined in a hypothetically
correct jury charge, we conclude that a rational jury could have inferred the
ultimate facts that King appropriated the currency, by acquiring or otherwise
exercising control over it, with the intent to deprive Torres, the owner, of
the currency by deception.  See
Jackson, 443 U.S. at 319; Malik, 953 S.W.2d at 240.          We
overrule King's fourth issue.

IV.  CHARGE ERRORBMISTAKE OF FACT
DEFENSE

By her first issue and
a sub-issue in her third issue, King asserts that the trial court reversibly
erred by refusing to include a proposed mistake of fact defense instruction in
the jury charge.  By her sixth issue, King
argues that omission of the requisite knowledge instruction was egregious
error.  King argues that the instruction
would have told the jury to acquit if it found King, through mistake, formed a
reasonable belief about a factual matter, if her mistaken belief negated the
kind of culpability required for commission of the offense.  The State counters that King's claim that she
was unaware the plan was a pyramid scheme is not a mistake of fact defense.

A.  Standard of Review








Our first duty in analyzing a jury‑charge
issue is to determine whether error exists. 
Middleton v. State, 125 S.W.3d 450, 453 (Tex. Crim.
App. 2003) (en banc) (citing Hutch v. State,
922 S.W.2d 166, 170-71 (Tex. Crim. App. 1996) (en banc)).  Then, if we find error, we analyze that error
for harm.  Middleton,
125 S.W.3d at 453.  Preservation of
charge error does not become an issue until we assess harm.  Id. 
The degree of harm necessary for reversal depends on whether
the appellant preserved the error.  Id.
(quoting Hutch, 922 S.W.2d at 171); see Almanza v. State,
686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g) (en
banc).  Thus, we review alleged charge
error by answering two questions: 
(1) whether error existed in the charge; and (2) whether sufficient
harm resulted from the error to compel reversal.  See Posey v. State, 966 S.W.2d
57, 60 n.5 (Tex. Crim. App. 1998) (en banc); see Ngo v. State, 2005 Tex.
Crim. App. LEXIS 457, at *8 (Tex. Crim. App. March 16, 2005) (en banc).  Under the Almanza  standard, the record must show that a
defendant has suffered actual, rather than merely theoretical, harm from jury
instruction error.  Posey,
966 S.W.2d at 60 n.5.  Errors
that result in egregious harm are those that affect "the very basis of the
case," "deprive the defendant of a valuable right," or
"vitally affect a defensive theory." 
Id.; Ngo, 2005 Tex. Crim. App. LEXIS 457, at *8.  Under Almanza, to determine whether
the error was so egregious that a defendant was denied a fair and impartial
trial, a reviewing court should examine (1) the entire jury charge, (2) the
state of the evidence, (3) the arguments of counsel, and (4) any other relevant
information in the record.  Id.


B. The Law








A defendant is entitled to the submission of every
defensive issue raised by the evidence, even if the defense may be inconsistent
with other defenses.  Bowen v. State,
162 S.W.3d 226, 262 (Tex. Crim. App. 2005). 
Furthermore, an accused has the right to an instruction on any defensive
issue raised by the evidence, whether that evidence is weak or strong,
unimpeached or contradicted, and regardless of what the trial court may or may
not think about the credibility of the defense. 
Hamel v. State, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996).  

C.  The Record

King testified about the origins of the club in
Canada and how it reached the county through Austin.  She surmised that the club was legal because
she observed prominent people at the meetings. 
She testified that the local district attorney announced publicly that
he would prosecute participants in the club. 
When participants contacted her after learning of the district
attorney's announcement, King told them that the club was not a pyramid.  Regarding her denial that the club was a
pyramid scheme, the following colloquy occurred during cross-examination:

Q:  Mrs. King,
just so I understand, Mrs. King, you understood that this scheme was not a
pyramid, is that correct?

 

A:  It was
never presented to me in that way.

 

Q:  Do you
have an understanding of what a pyramid scheme is?

 

A:  My general
understanding was that the person at the top is always receiving a benefit from
all the people that keep coming in. 
There is always one person at the top. 

 

Q:  And that
is a key fact for you, that there is always one person at the top?

 

A:  There is
always one person at the top.  Like, for
example, the person that started this in Canada would still be receiving all
the benefits of all the 5,000 people that came in McAllen, that sort of thing.

 








King further testified that, of all the persons
involved including the State's witnesses, she was singled out for prosecution.

The defense called an expert to testify as to
whether the WHW plan was a pyramid scheme. 
The expert testified that in a pyramid scheme, "the bottom line is
that people go in there for a particular reason and they want to make money
and, of course, basically it'sBthey want to end up [at the top]."  He further testified, "And, of course,
the bottom line is that people can move up, you know, and, of course, everybody
wants the American dream.  They want to
make a lot of money and they can eventuallyBthat
is the pyramid scheme."  The defense
expert enumerated the variables indicating that the WHW plan was not a
pyramid:  (1) the person would make
$20,000 and "get out"; in the traditional pyramid scheme, that person
would continue making money; (2) the participants' money was a giftBthere was no commission, no payment; (3) there was
no trade or commerce; usually in a pyramid scheme there is a sale of a product,
but here "it was a one-shot deal and that person could make $10,000 or
$20,000."  The expert emphasized
that the gifting document proved the money was "a gift . . . that was
given with nothing in return."  He
also emphasized that the money was presented "wrapped" as a gift and
was "not a payment."  The
expert's opinion was that, given all these considerations, the original dinner party
gifting and WHW was not a pyramid.  He
stated, "[f]rom my understanding, it may look like a pyramid but it is not
a pyramid."  In short, the expert's
definition of a pyramid scheme required the selling of a product or service.[15]








The State's evidence demonstrated that King assured
one participant that "this was not a pyramid and it was legal . . . that
the original dinner party had attorneys . . . that they were speaking
to."  The gifting documents admitted
in evidence required the participants to acknowledge "informed consent"
and "waive any and all liability" for not meeting ODP guidelines. 

The State argued that ignorance of the law was no
defense.  King represented there would be
a return and, when a person presents a gift, "gifting documents" are
not required by the gift recipient as King required.  The defense argued that King was unaware the
club was a pyramid or that it was illegal. 


D.  Charge
Error Analysis

The trial court charged the jury on the offense of
promoting, organizing, or operating a pyramid promotional scheme.  King asserts in her first issue on appeal
that the trial court erroneously denied her a requested instruction
on mistake of fact based on her testimony that she did not know the plan was
illegal or was a pyramid scheme.  The
State responds that the trial court properly denied the instruction. 








King preserved
error.  See Tex. R. App. P. 33.1.  There are
eight court charges, one for each of the indicted counts.  The charges instruct the jury on the culpable
mental state instruction under section 6.03 for each of the eight indicted offenses.  Tex.
Pen. Code Ann. _ 6.03 (Vernon
2003).  The pyramid-promotional-scheme
charges  contain King's requested
instruction on complicity involving the State's witnesses, see Tex. Pen.
Code Ann. _ 7.01 (Vernon 2003), and the statutory
definition for the offense.  See Tex. Bus.
& Com. Code Ann.
' 17.461(a)(6).  King argues that, by its terms, section 8.02
of the penal code involves a mistaken belief that negates culpability for all
the charged offenses.  See Tex. Pen.
Code Ann. _ 8.02 (Vernon 2003).  The State counters that ignorance of the law
is no defense under section 8.03(a) of the penal code, and the evidence does
not raise a mistake of fact defense.  See
Tex. Pen. Code Ann. _ 8.03(a) (Vernon
2003).  








The burden lies with the appellant to persuade the
reviewing court that the error was harmful. 
See Abdnor v. State, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994)
(en banc).  If the appellant is unable to
do so, the error will not result in reversal.  Id. 
We
conclude that King has not shown, nor do we find, error in the trial court's
charges to the jury.  King testified as
to her understanding of a pyramid scheme. 
Her understanding is not inconsistent with the definition of a pyramid
promotional scheme.  See Tex. Bus.
& Com. Code Ann.
' 17.461(a)(6).  King does not address how a mistaken belief
that the club was not a pyramid scheme negates culpability for the offense of
theft by deception.  She argues that she
suffered actual harm from the faulty jury instruction and that she was, in fact,
deprived of an acquittal on all charges. 
However, the jury convicted King on three out of eight counts,
demonstrating careful deliberation and consideration of the culpable mental
state definition in the charge as applied to the evidence before it.  That evidence includes King's and her
expert's definitions of a pyramid scheme. 
Based on this state of the record, we also conclude that King was
neither harmed nor "egregiously harmed" by any error in the charge
because (1) the jury could have given effect to her defense and acquitted her
under the instructions given, and (2), as we have already concluded, the
evidence is sufficient to support the offenses. 

We overrule King's first issue, the sub-issue
asserted in her third issue, and her sixth issue. 

V. 
CONSTITUTIONALITY CLAIMS

By her third issue,
King argues that the pyramid promotional scheme statute is unconstitutional as
worded and applied.  See Tex. Bus.
& Com. Code Ann.
_ 17.461. 
She asserts that the statute:  is
overbroad and violates her right to free speech under the First and Fourteenth
Amendments to the U.S. Constitution.  See
U.S. Const. amend. I,
XIV.  The State responds that the issue
is inadequately briefed and without merit.

A.  Standard
of Review

When reviewing the constitutionality of a statute,
we presume that the statute is valid and that the legislature acted reasonably,
not arbitrarily, in enacting the statute. 
Rodriguez v. State, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002).  The burden rests on the individual who
challenges the statute to prove its unconstitutionality.  Id. If a reasonable
construction of the statute will render it constitutional, the court must
uphold the statute.  Ely v. State,
582 S.W.2d 416, 419 (Tex. Crim. App. 1979) (en banc).








B.  Constitutionality Analysis

King argues that the statute unconstitutionally (1)
criminalizes conduct without proof of time, place, or knowledge that conduct is
criminally proscribed and (2)  contains
vague words that are not statutorily defined.[16]
 

1.  As Applied

In order to review an attack on the
constitutionality of a statute "as applied," the one challenging the
statute must have raised the issue in the trial court.  Tex.
R. App. P. 33.1(a)(1); Curry
v. State, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995) (en banc); Bader v.
State, 15 S.W.3d 599, 603 (Tex. App.BAustin 2000, pet. ref'd).  Since King did not raise an as‑applied
objection at trial, she has failed to preserve this objection for appellate
consideration.  Thus, we need not
consider whether the statute was unconstitutionally applied to her. 

2.  Overbreadth








In analyzing a facial challenge to the overbreadth
and vagueness of a law, the Supreme Court has stated that the first task is to
determine whether the statute reaches a substantial amount of constitutionally
protected conduct.  Village of Hoffman
Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 (1982).  Criminal statutes must be scrutinized with
particular care.  City of Houston v.
Hill, 482 U.S. 451, 459 (1987).  A
statute is overbroad if it sweeps within its coverage speech or conduct that is
protected by the First Amendment.  Clark
v. State, 665 S.W.2d 476, 482 (Tex. Crim. App. 1984) (en banc). 

Essentially, King
asserts that her sole conduct was to interpret presentations of speakers who
explained the pyramid scheme during the WHW gatherings.  She argues that, because her conviction was
based on that conduct, the statute impermissibly and unconstitutionally
proscribed her right to free speech. 
However, King testified that she received monetary gifts for purchases
of plates at her "dinner table" in the club, and thus, she promoted
the scheme by means other than her speech. 
The statute defines "promoting a pyramid promotional scheme"
to mean (1) inducing or attempting to induce one or more other persons to
participate in a pyramid promotional scheme, or (2) assisting another person in
inducing or attempting to induce one or more other persons to participate in a
pyramid promotional scheme, including by providing references.  Tex.
Bus. & Com. Code
Ann. '
17.461(a)(5)(A)-(B).  We have concluded
the evidence was sufficient to sustain her conviction under the statute for
other than her constitutionally protected speech, either oral or written.  Even so, we find no authority for the
proposition that translating a presentation that explains a prohibited criminal
scheme is protected by the First Amendment. 
The statute does not proscribe mere communication.  King's overbreadth challenge fails.  See Clark, 665 S.W.2d at 482.  

3.  Vagueness








We turn to King's
facial vagueness challenge.  Because the
statute implicates no constitutionally protected conduct, we uphold the
challenge only if the enactment is impermissibly vague in all of its
applications.  Village of Hoffman
Estates, 455 U.S. at 494.[17]  A statute is void for vagueness and lacks the
first essential element of due process when it either forbids or requires the
doing of an act in terms so vague that people of common intelligence must guess
as to its meaning and differ as to its application.  Id. at 498.  A statute that is not definite enough for a
person to know, understand, and apply its terms and provisions is void and
unenforceable.  Id.  A statute is unconstitutionally void for
vagueness if it specifies no standard of conduct or defines no core of
prohibited activity.  Briggs v. State,
740 S.W.2d 803, 806 (Tex. Crim. App. 1987) (en banc).  Thus, a statute is void for vagueness when
(1) it fails to give a person of ordinary intelligence fair notice of the
conduct prohibited, or (2) is so indefinite that it encourages arbitrary and
discriminatory enforcement.  Kolender
v. Lawson, 461 U.S. 352, 357 (1983); Clark, 665 S.W.2d at 482.








King focuses on
evidence that she did not know that the WHW club's gifting activity was
illegal.  She argues that the
complained-of words are capable of different meanings, and so, the statute
contains no standard for determining what a suspect must do in order to
satisfy, among other elements, the mens rea requirement of the prohibited
conduct.  Thus, she argues, the statute
is void for vagueness because it does not provide fair notice of the prohibited
conduct.  When a statutory term is not
directly defined, the term should be read in context and construed according to
the rules of grammar and common usage.  See
Pettijohn v. State, 782 S.W.2d 866, 868 (Tex. Crim. App. 1989) (en banc). 

The statute defines
the conduct that is proscribed.  See Tex. Bus.
& Com. Code Ann.
'
17.461(a)(5)(A)-(B).  King's
understanding of what an illegal pyramid scheme involved is not inconsistent
with the statute's terms.  The
complained-of words are accorded their ordinary usage.  Thus, read in the statutory context and
construed accordingly, they provide due notice of the proscribed conduct.  King's vagueness challenge fails.

We overrule King's
third issue.

VI.  DOUBLE JEOPARDY

By her seventh issue,
King asserts that the State was required to make an election to convict and
punish on Counts 1 and 2 (pyramid promotional scheme) or Count 5 (theft by
deception) because the convictions and sentences punish the same conduct and,
thus, violate the double jeopardy clause. 
The State counters that, among other things, the case involves three
convictions derived from a single trial and clearly involves the multiple
punishment aspect of jeopardy protection.

A.  The Law








The Fifth Amendment
provides that "no person shall . . . be subject for the same offence to be
twice put in jeopardy of life or limb . . . ."  U.S. Const. amend. V.;
see Lopez v. State, 108 S.W.3d 293, 295 (Tex. Crim. App. 2003).  The United States Supreme Court stated that
the Fifth Amendment guarantee against double jeopardy consists of three
separate constitutional protections.  North
Carolina v. Pearce, 395 U.S. 711, 717 (1969), overruled on other grounds, Alabama
v. Smith, 490 U.S. 794 795 (1989); Lopez, 108 S.W.3d at 295.  First, it protects against a second
prosecution for the same offense after acquittal.  Lopez, 108 S.W.3d at 295.  Second, it protects against a second
prosecution for the same offense after conviction.  Id. 
Last, it protects against multiple punishments for the same
offense.  Id.  In Texas, "No person for the same
offense shall be twice put in jeopardy of life or liberty; nor shall a person
be again put upon trial for the same offense, after a verdict of not guilty in
a court of competent jurisdiction." 
Tex. Code Crim.
Proc. Ann. art. 1.10 (Vernon 2005).

B.  The Record








The indictment alleged
three statutory offenses occurring on two different dates.  When the State rested its case in chief, King
sought a directed verdict on all eight counts alleged.  At that time, King argued that the State must
elect to proceed on either a pyramid promotional scheme or the theft by
deception offense, because they constituted the same offense.  After the jury returned its guilty verdict on
Counts 1, 2, and 5, King argued that the double jeopardy protections required
punishment on either Counts 1 (pyramid promotional scheme) or 5 (theft by
deception), not both, on grounds that she would be punished twice for the same
offense involving Torres' $5,000 gift. 
The defense requested punishment on either Count 1 or 5, not both.  The trial court denied the motion.  The trial court assessed (1) concurrent
punishment at two years in a State Jail facility, probated for five years, for
Counts 1, 2, and 5; (2) a $500 fine on Count 1; and (3) $5,000 restitution for
Count 1 and $2,500 restitution for Count 2. 


C.  Double Jeopardy Analysis

King argues that she
was impermissibly convicted and sentenced on Counts 1 and 5 for the same
conduct.  The sole double jeopardy
protection King has preserved and invoked by her seventh issue is double
jeopardy's bar against multiple punishments for the same offense.[18]
 Lopez, 108 S.W.3d at 295.  Thus, the sole question before us is whether
King was convicted and punished for the same offense on Counts 1 and 5. 

1.  Preservation of Error








Although an appellant
has the burden to preserve, in some fashion, a double jeopardy objection at or
before the time the charge is submitted to the jury, Gonzalez v. State,
8 S.W.3d 640, 642 (Tex. Crim. App. 2000) (en banc), a double jeopardy claim may
be raised for the first time on appeal, or even for the first time on
collateral attack, when: (1) the undisputed facts show the double jeopardy
violation is clearly apparent on the face of the record; and (2) enforcement of
usual rules of procedural default serves no legitimate state interests.  Id. at 643.  This Court concluded that under Gonzalez,
"if a double jeopardy violation is clearly apparent, the defendant will
prevail on appeal; if a double jeopardy violation is not apparent, the
defendant's claim fails on the merits regardless of whether he objected at
trial."  Jimenez v. State, 67
S.W.3d 493, 509 (Tex. App.BCorpus Christi 2002,
pet. ref=d).  We, therefore, analyze whether a violation of
the prohibition against double jeopardy is apparent from the record.

                                             2.  Blockburger Test

The double jeopardy
bar applies to multiple punishments where the two offenses for which the
defendant is punished or tried cannot survive the "same‑elements"
or "Blockburger" test.  United
States v. Dixon, 509 U.S. 688, 696 (1993) (citing e.g., Brown v.
Ohio, 432 U.S. 161, 168‑69 (1977); Blockburger v. United States,
284 U.S. 299, 304 (1932) (multiple punishment); Gavieres v. United States,
220 U.S. 338, 342 (1911) (successive prosecutions)).  When the same act or transaction violates two
different penal statutes, the two offenses are the same for double jeopardy
purposes if one of the offenses contains all the elements of the other; they
are not the same if each offense has a unique element.  Blockburger, 284 U.S. at 304.

3.  Analysis








The protection
provided by the double jeopardy clause of the United States Constitution has no
application where separate and distinct offenses occur during the same
transaction.  See Jones v. State,
514 S.W.2d 255, 256 (Tex. Crim. App. 
1974).  King was convicted on
three offenses:  (1) promoting,
organizing or operating a pyramid promotional scheme on October 19, 2000; (2)
promoting, organizing or operating a pyramid promotional scheme on November 2,
2000; and (3) theft by deception on October 19, 2000.  

We first analyze
whether it is apparent from the record that King's multiple convictions
constituted a double jeopardy violation. 
The record shows that, on October 19, 2000, King induced Torres and
other women to participate in a pyramid promotional scheme or assisted another
person in inducing Torres and other women to participate in a pyramid
promotional scheme.  Tex. Bus.
& Com. Code Ann.
' 17.461(a)(5)(A)-(B)
(Vernon 2002).  On the same day, King
unlawfully appropriated Torres' currency with the intent to deprive Torres of
the property.  Tex. Pen. Code Ann. '' 31.03,
31.01(1),(3).  As the conviction for the
pyramid promotional scheme offense was not based on the same conduct underlying
the conviction for theft by deception, we find no apparent violation of the
double jeopardy clause.  See Jimenez,
67 S.W.3d at 509.  Each conviction
required proof of entirely separate elements and were separate acts.  We, therefore, find that it is not apparent
from the record that King's convictions for the pyramid promotional scheme and
theft by deception violated the double jeopardy clause.  Id. 
Our analysis shows that there are no double jeopardy issues apparent on
the record.  See Id.  Therefore, we hold that King has failed to
preserve her issue on appeal and has waived her double jeopardy
challenges.  See id.

We overrule King's
seventh issue.








VII.  PRESERVATION OF ERROR

A.  Standard of Review








To preserve a
complaint for appellate review, a party must present a timely request,
objection, or motion to the trial court stating the specific grounds for the
desired ruling if the specific grounds were not apparent from the context.  Tex.
R. App. P. 33.1(a); Blue v. State, 41 S.W.3d 129, 131 (Tex.
Crim. App. 2000) (en banc); see Keeter v. State, 2005 Tex. Crim. App.
LEXIS 521, at *9 n.11 (Tex. Crim. App. April 6, 2005) (citing Lankston v.
State, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) (en banc) ("All the
party must do to avoid the forfeiture of a complaint on appeal is to let the
trial court know what he wants, why he thinks himself entitled to it, and to do
so clearly enough for the trial court to understand him at a time when the
trial court is in a proper position to do something about it.")).  Generally, a party's failure to timely and
specifically object at trial waives error. 
See Blue, 41 S.W.3d at 131.  An accused may waive even constitutional
rights.  Saldano v. State, 70
S.W.3d 873, 891 (Tex. Crim. App. 2002) (en banc); Jenkins v. State,
912 S.W.2d 793, 815 (Tex. Crim. App. 1995) (op. on reh'g) (en
banc).  Nonetheless, rule 103(d) of
the rules of evidence authorizes us in a criminal case to "take notice of
fundamental errors affecting substantial rights although they were not brought
to the attention of the court."  Tex. R. Evid. 103(d).  "Some rights are widely considered so
fundamental to the proper functioning of our adjudicatory process as to enjoy
special protection in the system."  Blue,
41 S.W.3d at 131.  "A principle
[sic] characteristic of these rights is that they cannot be forfeited.  That is to say, they are not extinguished by
inaction alone."  Id.  Instead, an accused must expressly relinquish
a fundamental right.  Id.   

B.  Restitution

By her second issue,
King asserts that the trial court reversibly erred by ordering restitution of
$5,000 in the judgment for Count 1 and $2,500 in Count 2.[19]  She asserts that because the complainant
Torres was in pari delicto with the gift recipients, Torres had unclean
hands, King did not cause the gift, King was not the recipient, Torres suffered
no economic loss, the evidence is insufficient to support the restitution
amount, and Torres did not seek restitution. 
Thus, King argues, the trial court had no power to order
restitution.  The State counters that
King did not preserve error.  

During the sentencing
phase, after the trial court pronounced punishment, the trial court addressed
restitution.  The defense's sole request
was that the trial court separate the restitution amounts and enter them in the
judgments for Counts 1 and 2.  King did
not present her complaints to the trial court before raising them in one issue
on appeal.  Thus, she has forfeited her
complaint.  Id.; see also Tex. R. App. P. 33.1.

We overrule King's
second issue.

C.  Selective Prosecution








By her fifth issue,
King asserts that the conviction must be reversed on grounds that she was
singled out for prosecution based on her race. 
Thus, she argues she was denied equal protection on grounds of invidious
discrimination.  King did not present her
complaint to the trial court.  Her
complaint is forfeited.  Tex. R. App. P. 33.1.

We overrule King's
fifth issue.

D.  Motion for New Trial

By her eighth issue,
King asserts that the trial court abused its discretion by refusing and failing
to schedule a hearing on her motion for new trial.  The reporter's record shows that, on January
21, 2003, the trial court acknowledged receipt of the motion for new
trial.  In open court, the trial court
pronounced it would not grant the motion for new trial.  Defense counsel's sole objection was,
"We object to your not ruling on our Motion for New Trial."  The trial court denied the motion.  The record does not demonstrate that King
requested that a hearing be scheduled. 
She forfeited her complaint.  See
Tex. R. App. P. 33.1.

We overrule King's eighth
issue.  

VIII.  CONCLUSION

Having overruled
King's eight issues on appeal, we affirm the judgment of conviction and
sentence on Counts 1, 2, and 5.                                                                                                                                         ERRLINDA CASTILLO

Justice

 

Publish.

Tex. R. App. P. 47.2(b).

 

Opinion delivered and filed

this the 18th day of August, 2005.

 











[1] See Tex.
Bus. & Com. Code
Ann. ' 17.461 (Vernon 2004).  





[2] See Tex.
Pen. Code Ann. '' 31.03, 31.01(3)(A) (Vernon
2004-05). 





[3] The complainant, Bartolita Torres,
testified, "Well, when you first give your money, they put you down right
here, the soup and salad.  If you bring
other people in, they push you up toBuntil you get to entree. 
If you bring more people in here, you get to the dessert and
party." 





[4] A hypothetically correct charge is
one that accurately sets out the law, is authorized by the indictment, does not
unnecessarily increase the State's burden of proof or restrict its theories of
liability, and adequately describes the particular offense.  Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Cano v. State, 3 S.W.3d 99, 105 (Tex.
App.BCorpus
Christi 1999, pet. ref'd).  A
hypothetically correct jury charge does not simply quote from the controlling
statute.  Gollihar v. State, 46
S.W.3d 243, 254 (Tex. Crim. App. 2001). 
Its scope is limited by the statutory elements of the offense as modified
by the charging instrument.  See Curry
v. State, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).  Malik flatly rejects use of the jury
charge actually given as a means of measuring sufficiency of the evidence.  See Gollihar, 46 S.W.3d at 252.  Malik controls sufficiency of the
evidence analysis even in the absence of alleged jury charge error.  Id. at 255.  

 





[5] As to Count 1, the indictment
alleged that, on or about October 19, 2000, King intentionally and knowingly did
contrive, prepare, establish, operate, promote, advertise and sell a pyramid
promotional scheme, namely, a plan and operation by which Bartolita Torres gave
consideration of $5,000 in United States currency for the opportunity to
receive compensation that was derived primarily from a person's introduction of
other persons to participate in the plan and operation, rather than from the
sale of a product by a person introduced into said plan and operation.





[6] As to Count 2, the indictment
alleged that, on or about November 2, 2001, King intentionally and knowingly
did contrive, prepare, establish, operate, promote, advertise and sell a
pyramid promotional scheme, namely, a plan and operation by which Bartolita
Torres gave consideration of $2,500 in United States Currency for the
opportunity to receive compensation that was derived primarily from a person's
introduction of other persons to participate in the plan and operation, rather
than from the sale of a product by a person introduced into said plan and
operation.





[7] Based on King's legal sufficiency
challenge, we review the evidence in the light most favorable to the
verdict.  See Jackson v. Virginia,
443 U.S. 307, 319 (1979).





[8] Garcia described the three levels
of King's diagram.  The bottom level,
known as the soup and salad level, had four plates.  The second level, known as the entree, had
two plates.  The top level, the dessert,
had one plate.  Each plate was $5,000 and
could be split in half.





[9] The jury acquitted King on Count 3
alleging a pyramid promotional scheme involving Garcia's money.





[10] Vega testified that King said she
"had a waiting list and she would bring in people.  She was bringing people in from San
Antonio."





[11] Tijerina was not interested in
"bringing people in."  She
testified that King spoke of "people lined up that were ready to come
in," including people from San Antonio.  






[12] When Torres gave $2,500 on
November 2, 2000, she signed a form, admitted in evidence. Torres had
previously signed a similar form when she gave $5,000.  The form states:

 

Original Dinner Partyr

Gifting Activity

INFORMED CONSENT AND ACKNOWLEDGMENT

 

By signing below, I have decided to
willingly participate in the gifting activities of the Original Dinner Partyr
(ODP).  I have been fully informed and as
a consenting adult, I acknowledge that no guarantee or assurances as to the
results that may be obtained from my participation have been given to me.  I have no expectation of gifts given by me to
be returned to me in any amount for any reason. 


I acknowledge that I have received
and read, or had read to me, the Original Dinner Partyr Guidelines (Revised
10.23.00 ), and I accept and agree to comply with the Original Dinner
Partyr Guidelines.  In the event I should
fail to abide by all of the Original Partyr Guidelines, I understand that I can
no longer consider myself a part of the Original Dinner Partyr and I waive any
and all liability on the part of the Original Dinner Partyr and/or its
participants.  

 

I further state that I have
attended at least two (2) Original Dinner Partyr-sanctioned informational
meetings.  

Dated                                                    WITNESSED:

 

 

--------------------------------------------                --------------------------------------------

Invitee Signature                                                Invitor
Signature

 

Printed
Name                                                    Printed
Name Table # 

 

 





[13] The prosecution is limited to
using proof of offenses occurring prior to the date of the indictment's
presentment and within the statute of limitations period; the prosecution is
not otherwise bound by the "on or about" date alleged in the information.  See Tex.
Code Crim. Proc. Ann. art. 21.02(6) (Vernon 1989); Sledge
v. State, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997) (en banc). 





[14] As to Count 5, the indictment
alleged that, on or about October 19, 2000, King unlawfully appropriated, by
acquiring and otherwise exercising control over, property, namely, $5,000 in
United States currency from Bartolita Torres, the owner, without the effective
consent of the owner by deception and with intent to deprive the owner of the
property.





[15] Regarding the expert's definition
of a pyramid scheme, the trial court stated, "Legally or illegally, I
think the jury is going to decide that down the road and I will give you the
definitions, if you will.  I will give
you the law, all the law you will ever need to decide the issues before
you."





[16] The complained of words are
"organize, establish, participate, contrive, prepare, advertise, sell,
induce, attempting to induce, assist another in inducing, and assisting another
in attempting to induce." 





[17] When a vagueness challenge
involves First Amendment concerns, the statute may be held facially invalid
even though it may not be unconstitutional as applied to the appellant's
conduct.  Long v. State, 931 S.W.2d
285, 288 (Tex. Crim. App. 1996).  There
is some authority that in the limited context of a facial challenge, an
appellate court must address the threshold as‑applied challenge even if
the issue was not raised below.  See
Sullivan v. State, 986 S.W.2d 708, 713‑14 (Tex. App.BDallas 1999, no pet.). 





[18] See our discussion on preservation
of error that follows.  King did not
complain to the trial court that the offenses were greater or lesser included
offenses of each other.  Thus, these
arguments are forfeited.  See Tex. R. App. P. 33.1. 





[19] The judgment for Count 1 reflects
$5,000 restitution ordered; the judgment for Count 2 reflects $2,500
restitution.