

**NUMBER 13-08-00729-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**EVERETT DURAN,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                         **Appellee.**

---

### On appeal from the 319th District Court
### of Nueces County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Yañez, Rodriguez, and Garza
### Memorandum Opinion by Justice Rodriguez

Appellant Everett Duran challenges his conviction after a jury trial for first-degree murder, for which the jury sentenced him to seventy-five years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02 (b)(1), (2) (Vernon 2003). By one issue, Duran argues that the evidence was legally and factually insufficient to prove he had the requisite mens rea. We affirm.

## I. BACKGROUND

In the late afternoon of April 4, 2008, fifteen-year-old Duran called 911 from his mother's apartment and told the dispatcher that his fourteen-year-old girlfriend, Tiffany Gonzalez, had been shot. Officers with the Corpus Christi Police Department (CCPD) rushed to the scene and found Duran pacing outside the apartment. Duran appeared agitated and upset. The officers went inside the apartment and discovered Gonzalez slumped over on the floor by Duran's bed with a gunshot wound to her head. The paramedics arrived on the scene and took Gonzalez to the hospital because she still exhibited vital signs. Gonzalez was pronounced dead that night. A medical examiner later determined the cause of death to be a gunshot wound to the head.

Duran was interviewed by CCPD but when he began to relate information that the investigators felt was incriminating, Duran was transported to the courthouse to be read his rights by a magistrate, as is required in juvenile interrogations. *See* TEX. FAM. CODE ANN. § 51.095(a) (Vernon 2008). After being read his rights, Duran gave a written statement to the police.

Duran was initially charged as a juvenile with aggravated assault and then manslaughter, but the State sought to transfer Duran's case out of juvenile court and certify him to stand trial as an adult. The juvenile court agreed that Duran should be tried as an adult and waived its jurisdiction over his case.[1] *See id.* § 54.02(a) (Vernon Supp. 2009). Thereafter, Duran was charged as an adult in a two-paragraph, one-count indictment for first-degree murder. The indictment read as follows:

---

[1]Duran does not challenge his certification to stand trial as an adult.

2

> [T]hat [Duran] . . . did then and there intentionally and knowingly cause the death of an individual, Tiffany Gonzalez, by shooting Tiffany Gonzalez with a firearm . . .
>
> . . . that [Duran] did then and there with the intent to cause serious bodily injury to an individual, Tiffany Gonzalez, do the act of shooting her with a firearm; that this act was clearly dangerous to human life; and that this act caused the death of Tiffany Gonzalez . . . .

See TEX. PENAL CODE ANN. § 19.02(b)(1), (2). Duran pleaded not guilty, and the jury trial of his case commenced on December 16, 2008.

## A. The State's Evidence

The State's first witness was Luis Gonzalez, Tiffany's father. Luis testified that, on the morning of the shooting, he dropped Tiffany off at her friend's house before school. He stated that Tiffany was very happy that morning. Luis testified that he had given Tiffany $200 to go shopping that afternoon after school. He stated that Tiffany never told him she had a boyfriend.

Next, the State presented the testimony of Sgt. Roberto Rodriguez, the CCPD officer who was the first on the scene in response to Duran's 911 call. Sgt. Rodriguez testified that when he arrived at the apartment, he found Duran waiting outside. Sgt. Rodriguez stated that Duran told him Gonzalez had shot herself; Duran also told Sgt. Rodriguez that he was in the shower when he heard the shot and that he thought Gonzalez was playing with the gun. Sgt. Rodriguez testified that he went into the apartment and found Gonzalez in Duran's bedroom, slumped over by the side of the bed, and that the gun was three to four feet from her. Sgt. Rodriguez stated that the blood from Gonzalez's wound was congealing, which was an indication that it had been there for a while. Finally,

3

Sgt. Rodriguez testified that he found half-eaten containers of food, school books, and papers in the bedroom.

The State then called Lydia Curiel, a communications manager for CCPD who handled the 911 call Duran made after the shooting. Curiel testified that, in the call, Duran stated that Gonzalez was playing with the gun. Curiel stated that Duran seemed upset and said several times "please hurry up," "please come quick," and "I don't know what to do."

Next, the State called Jason Smith, a CCPD officer who investigated the case. Officer Smith testified that he interviewed Duran on the day of the shooting. Duran told Officer Smith that he was "freaking out" and could not "think straight." Officer Smith testified that Duran seemed panicked and scared. Officer Smith testified that Duran described the events of that day to him. Duran told Officer Smith that he and Gonzalez had an argument that day, had consensual sex, had lain on Duran's bed to watch a movie, and that Gonzalez was playing with the gun. Duran also told Officer Smith that Gonzalez had given him the gun two weeks earlier; however, Officer Smith testified that Duran had earlier told a different officer that Gonzalez gave him the gun on the day of the shooting. Officer Smith stated that when Duran began making incriminating statements, he took Duran to the magistrate to be read his rights. Officer Smith further testified that he found a pregnancy test at the scene. Finally, Officer Smith testified that no money was recovered from Gonzalez's person.

Deanie King, the municipal court judge who read Duran his rights, testified next. Judge King read the text of Duran's written statement to the jury, which included, in relevant part, the following:

4

My name is Everett Duran. . . . On 4/4/08 I was at the apartment with my girlfriend Tiffany Gonzalez. We were lying on my bed, my gun was lying next to me. Tiffany wanted to see my gun, Tiffany tried to grab my gun. I asked her why. She didn't answer me. She just said, "Let me see it." I didn't let her. I grabbed it before she could. She had grabbed hold of the barrel and I was trying to get it from her, and I was telling her, "What are you doing? It's going to go off." When I tried to take the gun from her, she was fighting for it. We were kind of rolling around on the bed and the gun went off. The gun went off as I was trying to stand up. I was still on the bed when the gun went off. It only went off one time. There should be five more rounds in it. She was lying on the bed after the gun went off. I looked at her head and saw blood gushing out. I picked her up and looked at her head and put her down on the floor. I had the gun in my hand and I put it on the floor next to her, then I grabbed her. I don't remember if I put the gun in her hand or not. I was freaking out and my mind was spinning. I had blood on my hands and my shirt. I took off my shirt and put it into the closet. . . . I called my mom and told her that Tiffany shot herself and was dead. After I called my mom, I called 911 and told them to come, that my girlfriend was dead. I washed my hands in the bathroom upstairs and changed my shirt. Tiffany gave me the gun about two weeks ago. I do not know where she got it, but she gave it to me and told me to keep it. I kept the gun on the side of my bed. . . . I have shot the gun before on the first day she gave it to me. . . . I did not mean for this to happen. I was trying to prevent it from happening when I was trying to get the gun from her. Then I tried to clean the gun with a shirt.

After Judge King, the State called Carolyn Martinez and Kelly Martinez, both of whom performed forensics investigations on the night of the shooting. Carolyn testified that the gun found at the scene was a single-action revolver. Kelly described the crime scene and testified that she found condom wrappers on the bed and blood on the bedding and edge of the bed. Kelly also testified that she found blood smeared on the wall of the bedroom and a bullet on the floor. Kelly stated that no gunshot residue tests were performed on Gonzalez's hands because she was in the hospital intensive care unit at the time of Kelly's investigation on the night of the shooting.

Victoria Alvarado was the next witness called by the State. Alvarado testified that she was one of Gonzalez's friends. In her testimony, Alvarado described two incidents

involving Duran and the gun that occurred in the months prior to the shooting. Alvarado testified that, one time, she was at Duran's apartment with Gonzalez. Alvarado stated that Gonzalez was sitting on the bed beside Duran when Duran got on top of Gonzalez, pointed the gun at her, and asked Gonzalez if she was scared. In the second incident described by Alvarado, she and Gonzalez were at Duran's sister's house, and Duran showed them the gun again. Alvarado testified that both incidents occurred more than two weeks before the shooting.

Next, the State presented the testimony of Ray Fernandez, M.D., the medical examiner for Nueces County who performed the autopsy on Gonzalez's body. Dr. Fernandez testified that the fracture pattern at the base of Gonzalez's skull, the periorbital bleeding within Gonzalez's skull, and the gunshot residue particles in the tissue around the wound indicated that the muzzle of the gun was flush against Gonzalez's right temple when it was fired. Based on the foregoing, Dr. Fernandez concluded that the wound on Gonzalez's right temple was a contact wound. Dr. Fernandez also testified that the entrance wound on Gonzalez's temple was higher than the exit wound on the back of her head, which indicated that the bullet was on a downward path. Dr. Fernandez noted that there were no powder burns on Gonzalez's hands but that she had bruising on her upper right arm and left wrist that were consistent with blunt force trauma. On cross-examination, Dr. Fernandez stated that there was no muzzle imprint on Gonzalez's forehead; that the bruises on Gonzalez's arm and wrist could have been caused by any blunt trauma, including bumping into something; and that, even if a person was holding onto a gun when it fired, it is possible that there would be no powder burns on that person's hands.

6

Finally, the State called CCPD Detective Robert Lee McFarland, who investigated the text messaging records of Duran and Gonzalez. Detective McFarland testified that there was no information in either Gonzalez or Duran's text messages indicating that Gonzalez and Duran had been arguing or that Gonzalez was having suicidal thoughts.

## B. The Defense's Evidence

The defense presented the testimony of several witnesses rebutting the State's evidence and regarding the nature of Duran's relationship with Gonzalez. Hallie Rodriguez, Duran's sister, testified that Alvarado came to their mother's apartment on several occasions because she wanted a relationship with Duran. Hayley Ochoa, a friend of Duran and Gonzalez, stated that Alvarado is known to be a liar; Ochoa also testified that Duran and Gonzalez were a happy couple. Ruben DeLeon, Duran's grandfather, testified that he had been at the apartment on the day of the shooting to drop off a couch that he and Duran's grandmother were giving to the family. Ruben stated that he had met Gonzalez on several occasions and that Duran and Gonzalez seemed to be in love.

Next, the defense called Rachel DeLeon, Duran's mother. Rachel testified that she picked up Gonzalez on the day of the shooting and brought her to the apartment. Rachel stated that she helped Gonzalez take a pregnancy test, that the results were negative, and that Gonzalez and Duran were relieved by the results. Rachel then testified that she left Gonzalez and Duran at the apartment to go shopping with Hallie. While they were shopping, Rachel received a call from Duran that Gonzalez had shot herself. Rachel testified that she then rushed back to the apartment and found law enforcement and emergency medical personnel there when she arrived. Rachel confirmed that Alvarado had been to the apartment before on other occasions.

7

Finally, the defense presented the testimony of Reymundo Rodriguez, a deputy in the Nueces County Constable's office. Deputy Rodriguez stated that he was the firearms instructor for the constable's office and an adjunct law enforcement and firearms instructor at Del Mar College in Corpus Christi. Deputy Rodriguez testified that the gun that shot Gonzalez was an unsafe and unreliable weapon. Deputy Rodriguez stated that the gun was a remake of an western-style Colt single-action revolver and that it had a high probability of accidental discharge. Deputy Rodriguez explained that the firing pin in the gun is located directly over the ammunition round with the hammer resting on top of the firing pin. Deputy Rodriguez testified that the gun can fire

> if you touch the hammer without fully cocking the weapon . . . . All you need to do is just very slightly just pull this back slightly, let it go. It's a rim fire. If it hits the rim of that case the weapon will go off. Kind of like similar back in the old western movies, fanning, you barely touch it, you can make the gun go off real first [sic] fast. You know, the cowboys. So you don't even have to completely cock the hammer back to the fourth position to press the trigger for this weapon to go off. This weapon can go off at the slightest.[2]

Deputy Rodriguez also testified that he had experience in criminal investigations and that, if there was no ring around an entrance wound, it was not a contact wound.

After the close of evidence, the trial court presented the charge to the jury. The murder charge, tracking the indictment, authorized the jury to find Duran guilty of murder if it found beyond a reasonable doubt that Duran either: (1) intentionally or knowingly caused Gonzalez's death by shooting her with a firearm; or (2) with the intent to cause serious bodily injury, shot Gonzalez, which was an act clearly dangerous to human life that

---

[2]In response to Deputy Rodriguez, the State re-called Carolyn Martinez, who testified that she had firearms training, as well. She testified she had found indications on the gun's "cartridges" that they had been hit by the firing pin without firing, which indicated that the gun had misfired on several occasions. Martinez testified that the gun was unreliable but that she would treat it with respect regardless.

8

caused Gonzalez's death.[3]  After considering the evidence, the jury returned a general verdict convicting Duran of murder; the jury sentenced him to seventy-five years' incarceration and assessed a $7,500 fine.  This appeal followed.

## II. Standard of Review and Applicable Law

In conducting a legal sufficiency review, an appellate court must view all the evidence in the light most favorable to the verdict and determine not "'whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt,'" but rather, whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *Escamilla v. State*, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004).  The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony.  *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).  We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact.  *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham*, 29 S.W.3d at 151.  Instead, we resolve any inconsistencies in the evidence in favor of the judgment and consider whether the jury reached a rational decision.  *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *Beckham*, 29 S.W.3d at 151.

In a factual sufficiency review, we view all of the evidence in a neutral light to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt.

---

[3]The jury charge also included alternative instructions for manslaughter and criminally negligent homicide.

*Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). Evidence may be factually insufficient if: (1) it is so weak as to be clearly wrong and manifestly unjust, or (2) the jury's verdict is against the great weight and preponderance of the available evidence. *Id.* Unless the record clearly reveals that a different result is appropriate, we must defer to the fact finder's determination concerning the weight to be given to contradictory testimony. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). And unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the jury's verdict, we will not reverse the judgment as factually insufficient. *Watson*, 204 S.W.3d at 417.

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Malik*, 953 S.W.2d at 240. When, as here, a general verdict is returned by the jury and evidence is sufficient under any of the paragraph allegations submitted, the verdict will be upheld. *Davila v. State*, 952 S.W.2d 872, 875 (Tex. App.–Corpus Christi 1997, pet. ref'd).

Under a hypothetically correct jury charge in this case, a person commits the offense of murder if he "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life

10

that causes the death of an individual."  TEX. PENAL CODE ANN. § 19.02(b)(1), (2).  A person acts intentionally when it is his conscious objective or desire to engage in the conduct or cause the result.  *Id.* § 6.03(a) (Vernon 2003).  A person acts knowingly when he is aware of the nature of his conduct or of the circumstances surrounding his conduct and when he is reasonably certain his conduct will cause the result.  *Id.* § 6.03(b).

Every fact need not point directly and independently to the accused's guilt.  *Vanderbilt v. State*, 629 S.W.2d 709, 716 (Tex. Crim. App. 1981).  "Proof of a mental state, such as intent, must almost always be proved by circumstantial evidence."  *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.–Houston [14th Dist.] 2001, pet. ref'd).  As such, "the State may prove . . . criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence," and a conclusion of guilt can rest on the combined and cumulative force of all the incriminating circumstances.  *Gardner v. State*, No. AP-75,582, 2009 WL 3365652, at *4 (Tex. Crim. App. Oct. 21, 2009); *see Vanderbilt*, 629 S.W.2d at 716.

Intent to cause a victim's death, in particular, may be inferred from the surrounding circumstances, including the acts, words, and conduct of the accused and the extent of the injuries.  *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (en banc); *see also Hernandez v. State*, 190 S.W.3d 856, 866 (Tex. App.–Corpus Christi 2006, no pet.) (holding that intent to commit an offense may be inferred from the surrounding circumstances).  The jury, which holds the exclusive power to determine the issue of intent, may infer intent to kill from the use of a deadly weapon.  *Smith*, 56 S.W.3d at 745 (citing *Mercado v. State*, 718 S.W.2d 291, 295 (Tex. Crim. App. 1986)); *Davila*, 952 S.W.2d at

11

875.  Moreover, consciousness of guilt may be one of the strongest indicators of guilt, and false statements made by the defendant to cover up the crime and other subterfuge are proof of this consciousness.  *See Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.–Houston [14th Dist.] 2004, pet. ref'd); *Huffman v. State*, 775 S.W.2d 653, 660 (Tex. App.–El Paso 1989, pet. ref'd).

## III. DISCUSSION

By one issue, Duran complains that the evidence was legally and factually insufficient to prove he had the requisite mens rea to be convicted of murder.  Specifically, Duran argues that "the evidence adduced at trial" was insufficient to prove "him guilty of the intentional crime of murder."  We note at the outset that Duran's brief fails to address all of the several mental states upon which the jury could have convicted him—i.e, intentionally *or* knowingly causing Gonzalez's death; *or* intending to cause serious bodily injury and committing an act clearly dangerous to Gonzalez's life that causes her death.  *See* TEX. PENAL CODE ANN. § 19.03(b)(1), (2).  However, in the interest of justice and at our sole discretion, we will nevertheless examine the evidence presented at trial and determine whether it sufficed to support the jury's finding that Duran had the requisite mens rea.

The following is evidence from which a rational jury could have inferred Duran's guilt:  (1) Gonzalez's father gave her $200 on the morning of her death, but no money was recovered from her person after she was killed; (2) Duran seemed upset when he called 911 and appeared nervous and agitated when Sgt. Rodriguez encountered him outside the apartment; (3) Duran told inconsistent stories about when and where he got the gun, telling

12

one police officer that Gonzalez gave him the gun two weeks before the shooting and another officer that she gave him the gun the day of the shooting; (4) Duran told inconsistent stories about the incident, including that Gonzalez shot herself, that he was in the shower when he heard the shot and that he thought Gonzalez was playing with the gun, and, from Duran's written statement, that Gonzalez and he were wrestling over the gun and it accidentally fired; (4) after the shooting, Duran washed his hands in the bathroom, changed his shirt, and wiped down the gun; (5) the blood from Gonzalez's head wound was congealed by the time law enforcement and paramedics reached the scene, indicating that some time had passed between the shooting and Duran's call to 911; (6) Duran had, on two prior occasions, pulled the gun on Gonzalez and asked her if she was scared and both incidents occurred more than two weeks before the shooting; (7) the evidence gathered by Dr. Fernandez during Gonzalez's autopsy indicated that the gun was flush against Gonzalez's temple when it was fired and that the bullet was on a downward path; and (8) Dr. Fernandez noted that he found no powder burns on Gonzalez's hands but found bruises on Gonzalez's arm and wrist consistent with blunt force trauma.  *See, e.g., Ramirez v. State*, 229 S.W.3d 725, 729 (Tex. App.–San Antonio 2007, no pet.) (op. on reh'g) (upholding a murder conviction where the defendant claimed the shooting was an accident but failed to call the police or hospital, had blood on his shirt that was dried and crusted by the time he brought the victim to the hospital, and told inconsistent stories about the incident); *Leal v. State*, 800 S.W.2d 346, 348-49 (Tex. App.–Corpus Christi 1990, pet. ref'd) (affirming a murder conviction as supported by sufficient evidence, even though the defendant claimed he was playing with the gun and accidentally shot the victim, where the circumstances showed that the victim's money was missing after the shooting, that the

13

defendant did not promptly seek medical attention for the victim, and that the defendant's claims of being scared or panicked were arguably false).

Duran points us to several pieces of contrary evidence. First, he argues that there was no evidence of motive because the testimony at trial established that he and Gonzalez were a happy couple and that they were just eating and studying together in his bedroom that afternoon. Duran contends that there was no evidence of an argument or any other strife between him and Gonzalez. Motive is not an element of murder, however, and the State need not prove one to obtain a conviction. *See Lerma v. State*, 632 S.W.2d 893, 895 (Tex. App.–Corpus Christi 1982, pet. ref'd). The State's failure, if any, to prove motive is inconsequential when considered in context of the wealth of other evidence pointing to Duran's guilt. *See Vanderbilt*, 629 S.W.2d at 716.

Duran also argues that his varying accounts of the events surrounding the shooting were not entirely contradictory and do not suffice to prove his guilt. Furthermore, Duran contends that his guilt is not shown by the evidence that, after the shooting, he wiped the gun off, washed the blood off his hands, and took off his bloody shirt. Duran argues that the foregoing was merely conduct "consistent with [his] mental state, age, and situation." We disagree and conclude that the jury was entitled to consider both the inconsistent stories Duran told investigators and Duran's suspicious conduct following the shooting as circumstantial evidence of Duran's intent to kill Gonzalez. *See Patrick*, 906 S.W.3d at 487; *Ross*, 154 S.W.3d at 812 (holding that a false statement made by the defendant may be one of the strongest indicators of guilt); *Huffman*, 775 S.W.2d at 660 (noting that "[e]vidence of subterfuge . . . serves not only to negate attempted exculpatory hypotheses,

14

but also by its inherent connection to motive and sense of guilt, may provide affirmative evidence of culpability").

Finally, Duran argues that the physical evidence related to the gun and gunshot wound was not indicative of an intentional killing and that, generally, the evidence is more consistent with an accidental killing as opposed to an intentional one. Duran relies heavily on the testimony of Deputy Rodriguez, who stated at trial the gun used in the shooting was prone to accidental discharge. However, we fail to see how the reliability of the gun negates the ample evidence of Duran's guilt. In other words, it does not necessarily follow that the shooting was accidental merely because the gun used in commission of this offense has a high probability of accidentally firing.

In fact, the jury was entitled to infer intent to kill from the use of a deadly weapon alone. *See Smith*, 56 S.W.3d at 745. Moreover, the jury could have inferred that Duran intentionally caused Gonzalez bodily injury and committed a clearly dangerous act that led to Gonzalez's death from the following: the bruises on Gonzalez's arm and wrist coupled with the testimonial evidence that Duran had pointed the gun at Gonzalez on prior occasions and physical evidence that the gun was resting against Gonzalez's right temple when it was fired. *See Patrick*, 906 S.W.2d at 487. So, although Duran's evidence regarding the unreliability of the gun is some circumstantial evidence that the shooting may have been an accident, there was, as previously discussed, ample evidence that Duran either intentionally or knowingly caused Gonzalez's death or intentionally caused bodily injury to Gonzalez and committed an act clearly dangerous to human life that caused her death. *See Gardner*, 2009 WL 3365652, at *4; *Vanderbilt*, 629 S.W.2d at 716.

15

The jury here was free to accept or reject the testimony of any witness and evidently chose to believe the State's witnesses. We remain mindful of such findings and our attendant responsibility to defer to the jury's determination regarding the credibility of witnesses and weight to be given to the evidence. *See Lancon*, 253 S.W.3d at 705; *King*, 29 S.W.3d at 562. In sum, viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have determined that Duran was guilty of murder under either paragraph of the murder charge given to the jury in this case. *See* TEX. PENAL CODE ANN. §§ 6.03(a), (b), 19.02(b)(1), (2); *Laster*, 275 S.W.3d at 517; *Davila*, 952 S.W.2d at 875. Moreover, after considering all of the evidence in a neutral light, we cannot conclude that the evidence of Duran's mental state was so weak as to be clearly wrong and manifestly unjust or that the jury's verdict was against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15. Having concluded the evidence was legally and factually sufficient, Duran's sole issue is overruled.

## IV. CONCLUSION

The judgment of conviction is affirmed.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
1st day of April, 2010.

16